**E-FILED on ___6/24/05___**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JAYNE PALMISANO and RICHARD PALMISANO, individuals,<br><br>    Plaintiffs,<br><br>    v.<br><br>OLIN CORPORATION, a corporation, STANDARD FUSEE CORPORATION, doing business as ORION SAFETY PRODUCTS, a Delaware corporation, and DOES 1 through 50,<br><br>    Defendants. | No. C-03-01607 RMW<br><br>ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT<br><br>**[Re Docket Nos. 77, 81, 93, 94, 135, 166]** |
| AND ALL RELATED CASES | |

This is a toxic tort case. Four bellwether plaintiffs—(1) Cynthia and Joseph Dalla ("the Dallas"), (2) Robert Wess ("Wess"), (3) Tracy and Craig Smith ("the Smiths"), and (4) Teresa and Antonio Pereira ("the Pereiras")—have asserted causes of action for (1) negligence, (2) negligence *per se*, (3) strict liability for ultra hazardous activity, (4) trespass, (5) private nuisance, (6) public nuisance, (7) intentional and

1  negligent infliction of emotional distress, (8) statutory liability under the Comprehensive Environmental

2  Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq ("CERCLA"), and (9)

3  declaratory relief under CERCLA against defendant Olin Corporation ("Olin").  Complaints ¶¶ 1, 5-7, 41-

4  44, 52, 72, 77, 88.  Olin seeks summary judgment on the plaintiffs' first, second, third, fourth, fifth, sixth,

5  eight, and ninth causes of action.  Olin also moves to exclude the testimony of plaintiffs' expert Steven Lane

6  ("Lane").  The plaintiffs have filed cross-motions for summary judgment on their second, fourth, fifth, and

7  sixth causes of action.  The plaintiffs have also filed evidentiary objections and a motion to exclude the

8  testimony of Olin's expert Richard Pleus ("Pleus").[1]  The court has read the moving and responding papers

9  and considered the arguments of counsel.  For the reasons set forth below, the court (1) grants in part and

10 denies in part plaintiffs' evidentiary objections, (2) denies Olin's motion to exclude Lane's testimony, (3)

11 denies plaintiffs' motion to exclude Pleus' testimony, (4) grants in part and denies in part Olin's motion for

12 summary judgment, and (5) denies plaintiffs' motion for summary judgment.

## I.  BACKGROUND

14      Olin operated a safety flare manufacturing plant at 425 Tenant Avenue in Morgan Hill, California

15 ("the plant") between approximately 1956 and 1988.  Pearce Decl. Ex. A ("CAO") at 1.  The plant is

16 located in the Llagas sub-basin of the Gilroy-Hollister groundwater basin in South Santa Clara County.  *Id*.

17 In March 1988, Olin sold its flare-making business and leased the plant to Standard Fusee Corporation.

18 CAO at 1.  Standard Fusee produced flares at the plant until approximately 1996.  *Id*.  In 1997, Olin

19 decided to sell the plant.  Rutter Decl. Ex. P.  In August 2000, an environmental consultant working for a

20 potential buyer discovered potassium perchlorate ("perchlorate"), a potentially hazardous substance, in

21 groundwater beneath the plant.  McClure Depo. at 156:2-17.  Perchlorate is an ingredient in flares.[2]  Olin

---

23      [1]      Olin has also moved to exclude plaintiffs' property diminution expert, John Kilpatrick.  The
court will address this motion in a separate order.

25      [2]      Olin used approximately 140,000 to 160,000 pounds of perchlorate per year.  Chiolero
Depo. at 42:1-9.  Olin disposed of perchlorate waste by dumping it into an unlined "evaporation pond,"
burning it in open pits, and burying it.  *Id*. at 67:20-69:5, 75:9-16, 90:6-16, 102:14-103:5, Shifrin Report,
Pearce Decl. Ex. B ("Shifrin Report") at 7.

28 ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S
MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE
TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY
JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
DOH

1    informed the California Regional Water Quality Control Board ("the Board").  Rutter Decl. Ex. P.  In April

2    and June 2001, the Board issued Cleanup and Abatement Orders ("CAOs") to Olin.  The Board required

3    Olin to perform chemical analysis of water in private wells within a half mile of the plant.  The sampling

4    revealed the presence of perchlorate in various quantities in several wells.  *Id*. Exs. R, S.

5         In January 2003, the Santa Clara Valley Water District ("the SCVWD") brought the contamination

6    to public light.  In a series of press releases, the SCVWD asked residents to avoid "water suspected to

7    contain perchlorate."  Pearce Decl. Ex. G.  Olin and the SCVWD provided bottled water to residents in

8    affected areas.  Pearce Decl. Ex. UU.  On July 7, 2004, the Board ordered Olin and Standard Fusee to

9    supply bottled water to residents with contaminated wells.  Pearce Decl. Ex. AA.  On March 10, 2005, the

10   Board issued a CAO finding that (1) "Olin . . . was the sole property owner from at least 1956 to the

11   present, had knowledge of the activities that resulted in the discharge and the legal ability to control the

12   property and prevent the discharge"; (2) Olin's conduct "has created and threatens to create a condition of

13   pollution or nuisance"; (3) "[p]erchlorate from the [plant] is known to occur in underlying soil and ground

14   water and down gradient ground water"; (4) "the discharge of perchlorate . . . has interfered with the use of

15   hundreds of private domestic wells . . . . "; (5) "[p]erchlorate is a hazardous substance . . . [and] is a waste

16   as defined in California Water Code § 13050(d)"; and (6) requiring Olin to "abate potential and actual

17   effects."  Pearce Decl. Ex. A.

18        Perchlorate, a salt, is "odorless, colorless, and not detectable by taste in . . . small quantities."  Pleus

19   Decl. at 1.  Drinking water that contains perchlorate can cause health problems.  In sufficient quantities,

20   perchlorate can inhibit iodide uptake in the thyroid gland.  The thyroid produces an important hormone that

21   regulates metabolism, growth, and development.  Irregular thyroid levels in pregnant women can impair a

22   fetus' physical and mental development.  In January 2005, the National Academy of Sciences issued a

23   report entitled "Health Implications of Perchlorate Ingestion."  Rutter Decl. Ex. B ("NAS Report").  The

24   report concluded that consumption of perchlorate in doses of 24.5 parts per billion ("ppb") per day for life

25   is safe for "even the most sensitive populations."  NAS Report at 10.  In California, the Department of

26

27

28   ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S
     MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE
     TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY
     JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
     DOH

                                                        3

1    Health Services' ("DHS") "Notification Level" for perchlorate is currently 6 ppb.[3]  There are no uniform

2    federal standard for perchlorate in drinking water, although the Environmental Protection Agency ("EPA")

3    proposed a standard of 1 ppb in 2002.

4           The perchlorate plume extends approximately ten miles downgradient from the plant.   Pearce Decl.

5    Ex. A.  Each of the bellwether plaintiffs lives in San Martin.  All have been using bottled water for drinking

6    and cooking.  All draw water from the same aquifer via private wells.  However, they have detected

7    different amounts of perchlorate in their water.  The SCVWD and representatives from both parties have

8    tested the Dallas' well six times between February 24, 2004 and September 14, 2004.  Rutter Decl. Ex.

9    HH.  Five samplings detected no perchlorate.  *Id*.  One sampling revealed perchlorate concentrations of

10   0.68 ppb.  *Id*.[4]  Wess' well was tested four times between January 31, 2003 and August 3, 2004.  *Id*.

11   Twice, the samples did not contain perchlorate.  *Id*.  The other two samples contained perchlorate in

12   amounts of 1.2 ppb and 1.3 ppb.  *Id*.  The Smiths have detected perchlorate at 4.04, 4.12, and 6.0 ppb.

13   *Id*.  The Pereiras have detected perchlorate at levels between 8.4 to 11 ppb.

14          Plaintiffs seek to be reimbursed for (1) diminution in property values; (2) "loss of the use and

15   enjoyment of their property"; and (3) "inconvenience, discomfort, annoyance, mental suffering, or emotional

16   distress."  Pla.'s Opp. Mot. Summ. J. at 4:22-5:1.  Plaintiffs "do not seek damages for personal injury."  *Id*.

17   at 5:24-6.  Accordingly, on May 18, 2005, this court precluded plaintiffs from (1) "claiming damages for

18   emotional distress caused by any fear or anxiety that they have experienced or will experience physical

19   illness or disease" and (2) "offering evidence as to their medical conditions or their family's condition, unless

20   the condition has relevance to some issue other than fear of contracting or aggravating some disease or

21   illness."  May 18, 2005 Order at 6.  However, the court did not preclude plaintiffs "from seeking

22   compensation for emotional distress resulting from general disruption to their lives, loss of use of their

23

24   _____

25          [3]      A "Notification Level" is "the concentration level of a contaminant in drinking water
     delivered for human consumption that the [DHS] has determined, based on available scientific information,
26   does not pose a significant health risk but warrants notification."  Cal. Health & Saf. Code § 116455(c)(3).

27          [4]      Defendants contend that they were not invited to this sampling.

28   ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S
     MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE
     TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY
     JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
     DOH

1  property, annoyance, inconvenience, and the like caused by having to deal and put up with the allegedly

2  toxic water." *Id*.

## II.  ANALYSIS

### A.   Evidentiary Objections

#### 1.   The EPA Report

6  In 1989, a private company prepared a CERCLA Screening Site Inspection for the EPA.  Rutter

7  Decl. Ex. F ("the EPA report").  Olin offers the EPA report to prove the truth of several matters asserted

8  therein.  For one, Olin claims that the EPA report establishes that, in November 1979, the Board inspected

9  the plant and determined that "Olin's operations were not threatening state waters." *Id*. at 1-5.  Moreover,

10  Olin contends that the EPA report states that the DHS inspected the plant in December 1981 and

11  concluded "that there was no hazard." *Id*.  Finally, Olin offers the EPA report for its own conclusion that

12  the plant was not eligible for inclusion on the National Priorities List[5] because, *inter alia*, (1) "[t]he total

13  waste quantity on-site . . . appears to be small"; (2) "[t]he likelihood of a release of contaminants to

14  groundwater appears to be low"; and (3) "[t]here is no contamination in the nearby municipal well

15  attributable to the site." *Id*. at 6-2.

16  Plaintiffs challenge the admissibility of the EPA report on two grounds.  First, plaintiffs claim that

17  the report is not authenticated.  However, Olin has attached an authenticated version of the report to its

18  reply briefing.  Rutter Decl. Ex. P.  Because "there is no rule preventing a party moving for summary

19  judgment from . . . providing additional foundation materials with the reply [briefing]," *Fenje v. Feld*, 301

20  F. Supp. 2d 781, 811 (N.D. Ill. 2003), the court rejects plaintiffs' claim.

21  In addition, plaintiffs object that the EPA report is hearsay, and its references to reports by the

22  Board and the California Department of Health Services ("the DHS") are hearsay within hearsay.  The

23  court disagrees.  Federal Rule of Evidence 803(8)(C) exempts from the hearsay bar "record [and] reports

---

25  [5]   The National Priorities List is a list of polluted sites eligible to be cleaned up through

26  CERCLA.  *See, e.g., Johnson Controls, Inc. v. Employers Ins. of Wausau*, 665 N.W.2d 257, 267

  (Wis. 2003).

28  ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S
  MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE
  TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY
  JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
  DOH

. . . setting forth factual findings resulting from an investigation made pursuant to authority granted by law unless the sources of information or other circumstances indicate lack of trustworthiness." Thus, "EPA reports are generally admissible under Rule 803(8)(C)." *O'Dell v. Hercules, Inc.*, 904 F. 2d 1194, 1206 (8th Cir. 1990). Plaintiffs note that a private contractor produced the report on behalf of the EPA. By itself, however, this fact does not render the EPA report untrustworthy. *See U.S. v. Davis*, 826 F. Supp. 617, 621 (D. R.I. 1993) (EPA report not untrustworthy even though "it was prepared by a private contractor"); *Johnson v. City of Pleasanton*, 982 F. 2d 350, 352 (9th Cir. 1992) ("[a] party opposing the introduction of a public record bears the burden of coming forward with enough negative factors to persuade a court that a report should not be admitted"). Finally, the Board and DHS reports qualify as exceptions to the hearsay rule because they too fall within Rule 803(8)(C). The EPA report supports its assertions about the contents of the Board and DHS reports with citations to the actual underlying reports. *See* Advis. Comm. Notes, 1972 amend. ("[t]he rule makes no distinction between federal and nonfederal offices and agencies"); *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 170 (1988) ("portions of investigatory reports otherwise admissible under Rule 803(8)(C) are not inadmissible merely because they state a conclusion or opinion"). Thus, thus court overrules plaintiffs' objection to consideration of the EPA report as evidence in support of Olin's motion for summary judgment.

### 2.   Chiolero's Statements

Plaintiffs also move to exclude statements made by Jerry Chiolero, Olin's former plant manager. Plaintiffs claim that Olin offers these statements "to support an inference that the Board was aware of Olin's operations at the Morgan Hill facility, including Olin's use of an evaporation pit for dumping perchlorate waste." Mot. Excl. at 5:15-18. By plaintiffs' own description, however, these statements are non-hearsay: they are not offered for the truth of the matter asserted, but to prove the Board's knowledge.[6]

---

[6]     The statements include (1) "I recall that he asked if we had changed any of our operation inclusive of the evaporation pit" (Chiolero Depo. at 124:3-9), (2) "He referenced flare manufacturing and clay targets" (*id*. at 125:10-11) (3) "He asked me if [the evaporation pit] was still there and still in use" (*id*. at 125:12-15) and (4) "He asked me if we had changed any of our operations and was the evaporation pit still in use" (*id*. at 137:20-25).

ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW DOH

6

1    Plaintiffs also object to a memorandum dated February 13, 1980 from Chiolero to J.M. Henske.

2    The document states that "[t]he result of this inspection was that present methods were excellent in

3    protecting the local water systems; but they could not be certain if past methods were satisfactory."  Rutter

4    Decl. Ex. I.  Olin claims that the memorandum is admissible either (1) as a recorded recollection or (2) as a

5    business record.  However, Olin has not laid an adequate foundation for either of these exceptions to the

6    hearsay bar.  *See* Fed. R. Evid. 803(5) and 803(6).  In addition, even assuming Chiolero made such

7    reports in the regular course of business,[7] such records are still inadmissible hearsay if circumstances

8    indicate a lack of trustworthiness.  *See* Fed. R. Evid. 803(6).  Because this Olin document calls its own

9    practices "excellent," there is reason to be cautious here.  Thus, the court sustains plaintiffs' objection to

10   Olin's use of this memorandum to support its summary judgment motion.

### 3.    Norwood's Statements

12   Next, plaintiffs move to strike certain deposition testimony given by Olin's former Vice President of

13   environmental affairs, Verill Norwood.  Plaintiffs claim that Olin offers Norwood's testimony to prove that

14   the Board determined that Olin was not threatening state waters.  Norwood's first statement is that he

15   based his information that the Board had visited the site from seeing "notes . . . where they said we don't

16   have concerns with the site."  Norwood Depo. at 124-125.  Because Olin offers this for the truth of

17   Norwood's statement that the Board had no concerns with the site, which is itself based on hearsay "notes,"

18   the court sustains plaintiffs' objection.[8]  Finally, plaintiffs object to two of Norwood's deposition exhibits.

19   The first is handwritten notes claiming that the "[s]tate visited MH as follow-up to Eckhardt survey.  Agreed

20   no groundwater problems.  Said aerial photos substantiated little on site burial.  No [s]tate concern re

21   burials."  Rutter Decl. K-1.  The second is a nearly identical memorandum, dated May 10, 1982.  *Id.* K-2.

22   Both are inadmissible hearsay.  They are offered to prove exactly what they assert: that there were no

---

25   [7]    Olin claims that Chiolero testified as such, but directs the court to a page in his deposition
that is not attached to its moving papers.

26   [8]    Plaintiffs also object to Norwood reading from the EPA Report.  As noted, this is not
impermissible.  Norwood Depo. at 198:24-199:13.

ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S
MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE
TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY
JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
DOH

groundwater problems at the plant.  Olin has not shown that the statements meet the requirements for

admission as business records.  Accordingly, the court sustains plaintiffs' objections to the memoranda.

### C.    *Daubert* Motions

Federal Rule of Evidence 702 provides that courts may admit expert testimony if it is both relevant

and reliable:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or education, may testify thereto in the form of an
> opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and methods, and (3) the witness has applied
> the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993) (proponent of

expert testimony must prove admissibility by a preponderance of the evidence).  Federal Rule of Evidence

403 also mandates the exclusion of evidence that is substantially more prejudicial than probative.

To determine whether an expert's proposed testimony is reliable, a trial judge may consider (1)

whether it can be tested or whether it is purely subjective; (2) whether it has been subject to peer review

and publication; (3) the known or potential rate of error; (4) the existence and maintenance of controls; and

(5) whether it has been generally accepted in the scientific community.  *See Kumho Tire Co., Ltd. v.

Carmichael*, 526 U.S. 137, 149-50 (1999).  In addition, "any step that renders [an expert's] analysis

unreliable . . . renders the expert's testimony inadmissible.  That is true whether the step completely changes

a reliable methodology or merely misapplies that methodology." *In re Paoli R. R. Yard PCB Litigation*,

35 F.3d 717, 745 (3d Cir. 1994).

### 1.    Motion to Exclude Lane

Scientists employ EPA Method 314.0 ("Method 314.0") to detect perchlorate in water.  Method

314.0 has a Method Detection Limit ("MDL") and a Minimum Reporting Level ("MRL").  The MDL is "the

minimum concentration of an analyte that can be identified, measured, and reported with a 99% confidence

that [its] concentration is greater than zero."  Method 314.0, § 3.16, at 6.  The MRL is "the minimum

concentration that can be reported as a quantified value for a target analyte in a sample following analysis."

*Id*. at § 3.17, at 6.  Thus, the MDL is the level above which Method 314.0 can accurately detect *whether*

perchlorate is present. The MRL is the level above which Method 314.0 can detect *how much* perchlorate is present.  According to Olin, Method 314.0 typically has an MDL of 2.0 ppb and an MRL of 4.0 ppb. Miller Decl. Ex. H-3.  Calscience Environmental Laboratories, Inc. ("Calscience"), the laboratory used by plaintiffs, claims to have an MDL of 0.46 ppb and an MRL of 2.0 ppb.

Plaintiffs initially disclosed Robert Morrison ("Morrison") as their expert regarding the presence and quantity of perchlorate in their water.  Morrison collected samples and used Calscience to analyze them.  In his expert report, Morrison notes that he detected perchlorate in quantities of 0.86 ppb in the Dallas' well and 1.2 ppb in Wess' well.  Miller Decl. Supp. Mot. Excl. Ex. F.  Morrison qualified these results with "J-flags" because they were below Calscience's MRL of 2.0 ppb.  Olin identified Shane Snyder ("Snyder") as its expert in response to Morrison.  *Id.* at H-1.  Snyder criticized Morrison for not being able to vouch for Calscience's ability to verify its purported detections under 2 ppb.  *Id.*  Plaintiffs then designated Steven Lane ("Lane"), Calscience's Laboratory Director, to rebut Snyder's opinion.  Lane stated that he was "99% certain" that the J-flags indicate the presence of perchlorate in the Wess and Dalla wells (Lane Depo. at 131:22-132:4) and that even with a J-flag, "the qualitative determination of its presence remains valid." Lane Report at 2.  Olin moves to exclude Lane's opinion.

### a.    Lane's Opinion in Conjunction With Other Experts' Opinions

Olin first argues that the court should exclude Lane's opinion because plaintiffs have no other evidence that the perchlorate in the Dallas' and Wess' wells stems from the plant.  Olin contends that introducing Lane's testimony would impermissibly allow plaintiffs to meet their burden of showing causation through a rebuttal witness.  Olin claims that plaintiffs' expert hydrologist, Eric Nichols ("Nichols") failed to link the Dallas' and Wess' contamination to the site.  According to Olin, Nichols "conceded" during his deposition "that 'there just simply isn't enough data at this stage to assess the likelihood of impact' of perchlorate from the [plant] on the Wess and Dalla wells."  Mot. Excl. at 9:23-25 (quoting Nichols Depo. at 121:24-122:4).

Olin's argument is not persuasive.  For one, Olin takes Nichols' statement out of context.  Nichols' opinion is that it is "more likely than not" that percholate either had infiltrated or would infiltrate the Dallas'

1   and Wess' wells in amounts between 2 and 4 ppb.  Nichols Depo. at 102:7-21.  One basis for Nichols'

2   opinion was that such concentrations have been discovered in nearby wells.  *Id*. at 104:19-23.  However,

3   Olin's counsel asked Nichols to explain why the Dallas and Wess had yet to detect perchlorate in their

4   wells.[9]  Olin's counsel asked whether it was possible that "there are migration pathways that exist on the

5   eastern boundry of the plume that bypass the Wess and Dalla wells[.]"  *Id*. at 120:8-11.  Nichols responded

6   that it is "possible for preferential pathways to exist."  *Id*. at 120:18-22.  A "preferential pathway" is an

7   especially permeable subsurface region "that facilities the movement of groundwater in a particular

8   direction."  Nichols Decl. Supp. Opp. Mot. Excl. ¶ 7.  Olin's counsel then asked whether it was "the case

9   that the plume is insufficiently characterized for you to determine the existence or absence of preferential

10  pathways that would lead to or bypass the Wess and Dalla wells[.]"  *Id*. at 121:17-20.  To this specific

11  question, Nichols responded: "I think it is the fact that the plume is so poorly characterized, that is the

12  nature of my opinion, that you cannot rule out the impacts of the Wess and Dalla wells, either currently or in

13  the future.  There just simply isn't enough data at this stage to assess the likelihood of impact."  *Id*. at

14  121:24-122:4.  Thus, Nichols stated that he was incapable of knowing whether a *preferential pathway*

15  could "impact" the wells in question.  Nichols did not state that he lacked data to analyze whether

16  *perchlorate* could flow into the wells.  Olin does not contend that a preferential pathway must exist in order

17  for perchlorate to leach into groundwater.

18      Olin also contends that neither Lane nor Nichols distinguished between naturally-occurring

19  perchlorate and perchlorate from the plant.[10]  Olin claims that *Clausen v. M/V New Carissa*, 339 F.3d

20  1049, 1058 (9th Cir. 2003) and *Claar v. Burlington Northern R.R. Co.*, 29 F.3d 499, 502 (9th Cir.

21  1994) explain that courts may strike experts who do not consider alternative causal hypothesis.  However,

22  both *Claussen* and *Claar* involved experts who opined that specific chemicals caused a physiological

23  _____

24      [9]      Lane had already reported his "J-flagged" detections of perchlorate in the Dalla and Wess
        wells at the time of Nichols' deposition.  Why Nichols did not know about this is unclear.

25      [10]     Nichols acknowledged that other potential sources of perchlorate included "the use of
26  highway safety flares, some agricultural fertilizers, fireworks, matches, dyes, lubricating oils, air bag
        inflators, plaints, electroplating and medical speciality tests."  Nichols Report at 13.

27

28  ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S
        MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE
        TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY
        JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
        DOH

reaction.  The expert in *Claussen* performed "differential diagnosis": a technique used to identify the cause of a medical problem "by eliminating likely causes."  *Claussen*, 339 F.3d at 1057.  Against this backdrop —where the expert's methodology is no more than the process of elimination itself —the Ninth Circuit remarked that "[a] district court is justified in excluding evidence if an expert 'utterly fails . . . to offer an explanation for why the proffered alternative cause' was ruled out."  *Id*. at 1058 (quoting *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001)).  Likewise, *Claar* featured experts who made no effort "to rule out other possible causes for the injuries plaintiffs complain of, even though they admitted that this step would be a standard procedure before arriving at a diagnosis."  *Claar*, 29 F.3d at 502.

Lane's opinion does not necessitate ruling out other sources of perchlorate.  Indeed, Lane merely stated that Calscience's J-flagged results indicate the presence of perchlorate.  Of course, Lane need not shoulder plaintiffs' entire causation burden:

> [E]vidence does not warrant exclusion simply because it fails to establish the causal link to a specified degree of probability.  The fitness prong of the *Daubert* admissibility inquiry primarily concerns relevance.  The dispositive question is . . . not whether the testimony satisfies the plaintiff's burden on the ultimate issue at trial . . . .  That [s]pecific testimony alone may be insufficient for [plaintiffs] to survive summary judgment does not necessarily defeat its admissibility under the 'fitness' prong of *Daubert*.

*Ambrosini v. Labarraque*, 101 F.3d 129, 135-36 (D.C. Cir. 1996).

Nichols' opinion —that "there is a clear nexus between the perchlorate releases at the [s]ite and the detections of perchlorate in the San Martin area"—involves far fewer potential causes than the opinions in *Claussen* and *Claar* and supports the comparatively intuitive notion that perchlorate from the site is turning up in nearby wells.  Nichols Report at 13.  But more importantly, this is not a motion to exclude Nichols.  This is a motion to exclude Lane.  In the absence of a *Daubert* motion directed at Nichols, the court must assume that Nichols' opinion will be offered into evidence—even if it is flawed.  Nichols' testimony tends to show that perchlorate from the plant is present in plaintiffs' wells.  Accordingly, Olin fails to persuade the court that plaintiffs' causation evidence is so tenuous that it would be improper to permit Lane to testify.

ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW DOH

11

**b.      The Reliability of Lane's Methodology**

Olin next contends that Method 314.0 cannot reliably detect the presence of low levels of

perchlorate in groundwater.  In the context of DNA evidence, the Ninth Circuit has held that "imperfectly

conducted laboratory procedures" go not to the admissibility, but to the weight of the evidence:

> [O]ther laboratories . . . would have declared a nonmatch when comparing [the defendant's] DNA sample with the evidentiary sample.  With regard to admissibility, the mere existence of scientific institutions that would interpret data more conservatively scarcely indicates a 'lack of general acceptance' under *Daubert* 's fourth factor.  Similarly, the testimony indicates disagreement over, not an absence of, controlling standards for purposes of the second part of *Daubert*'s third factor, focusing on whether such standards exist and are maintained.

*U.S. v. Chischilly*, 30 F.3d 1144, 1154 (9th Cir. 1994).

Olin argues that Calscience has failed to satisfy *Daubert*'s first factor because it has not verified its

ability to detect low levels of perchlorate in groundwater instead of de-ionized lab water.  Olin claims that

groundwater contains conductive ions.  Olin asserts that because Method 314.0 relies on ion

chromatography, conductive water can impair its accuracy.  Olin's argument lacks merit.  Method 314.0

mandates that labs establish MDLs in de-ionized water, *id*. at § 9.2.6 and adjust for conductivity through

the use of a matrix conductivity threshold ("MCT"), *id*. at § 9.2.8.  Calscience's MCT is 4,000 Siemans per

centimeter.  Lane Depo. at 112:23-113:14.  Method 314.0 requires labs to determine the conductivity of a

matrix before "conducting any field sample analysis" and "dilut[e] or pretrea[t]" the sample only if it is

"above the MCT."  *Id*. at § 9.2.8.12.  Lane testified that Calscience "conducted an analysis of the

conductivity of each sample received from . . . Morrison's sampling team prior to the analysis of each

sample."  Lane Depo. at 53:16-20.  Calscience determined that groundwater from the Llagas sub-basin

had a value of only 500 to 1,000 Siemans per centimeter.[11]  Method 314.0 thus did not require Calscience

to alter its procedures because the sample in question was groundwater.  Therefore, although Calscience

---

[11]      In compliance with Method 314.0, Calscience also tested its ability to recover a 2.0 ppb spike in a more conductive sample: one with 4000 Siemans per centimeter.  *Id*. at § 9.2.8.11.  Calscience recovered amounts of 2.014 ppb and 1.917 ppb.  Rapazzini Decl. Ex. C.  Of course, this does not prove that Calscience can recover sub-2.0 ppb perchlorate concentrations in groundwater.  Nevertheless, because water from the Llagas sub-basin is far less conductive than 4000 Siemans per centimeter, Calscience's experiments are probative of its ability to detect the presence of perchlorate in low concentrations in plaintiffs' wells.

ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW DOH

1  has not specifically tested its ability to detect trace amounts of perchlorate in groundwater, Olin fails to

2  show that the results are unreliable.[12]

3       Olin also contends that Calscience's MDL is too low and thus "suspect."  Mot Excl. at 16:2.  To

4  derive its MDL, Calscience spiked seven samples of perchlorate at 1.5 ppb and retrieved results ranging

5  from 1.354 to 1.718 ppb.  Miller Decl. Ex. N.  The standard deviation for the test was 9.1%.  Snyder

6  Decl. ¶ 15.  Olin cites an article entitled *Trace Analyses for Wastewaters*—which Olin asserts that

7  Method 314.0 endorses—in support of the counterintuitive notion that an MDL with a standard deviation

8  below ten percent is unreliable.  Miller Decl. Ex. K ("the Glaser article").  However, the Glaser article was

9  written in 1981.  As Olin acknowledges elsewhere in its briefing, there has been a sea change in instrument

10  technology in the last two decades.  Indeed, Method 314.0, published in 1999, provides an illustration of

11  MDLs with standard deviations very close to Caliscience's.  *Id*. at 37. Moreover, Method 314.0 cites the

12  Glaser article simply to define the term "Method Detection Limit."  *Id*. at § 3.16.  Finally, Calscience

13  verified its MDL by twice spiking water with 0.8 ppb of perchlorate.  Calscience detected 0.8 ppb and

14  0.772 ppb of perchlorate.  Rapazzini Decl. Exs. E, 5.  These results reinforce the conclusion that Lane's

15  endorsement of Calscience's MDL is sound enough to survive Olin's *Daubert* challenge.

16       Olin next contends that the scientific community recognizes that Method 314.0 cannot reliably

17  indicate the presence of perchlorate in concentrations below 2.0 ppb.  First, Olin notes that the

18  Massachusetts Department of Environmental Protection ("MADEP") permits sub-2.0 ppb perchlorate

19  quantiations only after an onerous quality assurance process.  Snyder Decl. ¶¶ 18-20.  Second, Olin quotes

20  from a Los Alamos National Laboratory news article that Method 314.0 "is reliable only for concentrations

21  of four parts per billion or greater."  Miller Rep. Decl. ("Miller II Decl.") Ex. E.  Third, Olin notes that the

22  Navy Quality and Accreditation Office states that "[m]ethods other than 314.0 must be used if target MRL

23  < 4 ppb."  Miller II Decl. Ex. H.  This argument is unpersuasive.  For one, three sources hardly indicate a

24  consensus.  In addition, of the three sources, only the Los Alamos article addresses the issue of perchlorate

25

26      [12]    Plaintiffs also note Method 314.0 gives laboratories the freedom to establish their MRL as
low as their lowest calibration standard.  *Id*. at § 3.17.

27

28  ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S
MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE
TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY
JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
DOH

1    detection, rather than perchlorate quantitation.  Indeed, Lane's opinion is that Calscience can determine

2    whether perchlorate is present in the J-flagged results, not that Calscience can determine how much

3    perchlorate is present.  In fact, Richard Pleus ("Pleus"), Olin's toxicology expert, asserts that "some analytic

4    chemists believe that they can detect perchlorate at levels at or below 1 ppb."  Pleus Report at 7.  Pleus'

5    statement belies Olin's argument that Calscience's MDL is aberrant.

6         Finally, Olin claims that Morrison's crews failed to collect field blanks, control blanks, and field

7    spikes.  When scientists test a specific source for a contaminant, field blanks, control blanks, and field

8    spikes rule out false positives that stem from the contaminant's presence in other sources.  However,

9    Method 314.0 does not require these procedures.  Instead, it provides that "laborator[ies] must analyze

10   either a field duplicate, a laboratory duplicate, or a duplicate LFM."  *Id.* at § 9.4.2.  "LFMs" are

11   "laboratory fortified mechanisms," also known as "matrix spikes."  Calscience did, in fact, perform matrix

12   spikes.  Lane Report at 2.  Plaintiffs also offered evidence that field blanks—which involve trapping

13   airborne particles—are more appropriate when testing for volatile chemicals or metals than for perchlorate,

14   which is highly stable in water and unlikely to become airborne.  Morrison Decl. ¶¶ 5-7.  Olin is free to

15   contend otherwise through "[v]igorous cross-examination [and] presentation of contrary evidence": the

16   "traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at

17   596.  For these reasons, the court denies Olin's motion to exclude Lane.

18                    **2.    Motion to Exclude Pleus**

19        Plaintiffs move to exclude Pleus' testimony.  Pleus' expert opinion is that perchlorate is safe in doses

20   up to 200 ppb.  Graham Decl. Supp. Mot. Excl. ("Graham Decl.") Ex. E ("Pleus Report") at 3.  Pleus co-

21   authored an article ("the Greer study") that examined the health effects of perchlorate exposure on thirty-

22   seven adults for two weeks.  *Id.* Ex. D.  The study concluded that, in general, "a perchlroate concentration

23   of 180-220 ppb (and possibly much higher) should be of no health concern in iodine-sufficient populations."

24   *Id.* at 934.

25        Plaintiffs first argue that Pleus is unreliable because he has testified at least twelve times on behalf of

26   the Perchlorate Study Group ("PSG"), a consortium of heavy perchlorate users.  *Id.* Ex. F.  The Ninth

27

28   ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S
     MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE
     TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY
     JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
     DOH

1   Circuit has remarked that one factor for courts to consider is whether an expert wishes to testify "about

2   matters growing naturally and directly out of research they have conducted independent of the litigation, or

3   whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow*

4   *Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). Plaintiffs note that Pleus (1) lobbied the California

5   EPA to adopt a Public Health Goal for perchlorate in drinking water of 200 ppb, *id*., (2) forwarded proofs

6   of the Greer study to PSG members for comment, Pleus Depo. at 155:9-156:11, (3) re-wrote a

7   newspaper article that "was potentially very damaging to [the] PSG," Graham Decl. Exs. G, H, (4) tried to

8   influence the NAS study, *id*. Ex F, and (5) insists that the perchlorate doses described in the NAS study

9   need not be reduced for infants—a point with which NAS Committee Chair Richard Johnston disagrees,

10  Pleus Depo. at 128:1-21, Graham Decl. Ex. I. Nevertheless, the Greer study has been widely acclaimed.

11  The EPA has dubbed it a "principal" study, Miller Decl. Supp. Opp. Mot. Excl. ("Miller Decl.") Ex. C and

12  the National Research Council has recommended it to "derive the point of departure for . . . risk

13  assessment." *Id*. Ex. D. Pleus' opinion has sufficient indicia of reliability to outweigh his alleged bias.[13]

14       Plaintiffs then contend that the Greer study does not establish that the water in San Martin is safe

15  because it did not include pregnant women, fetuses, infants, children, or individuals with pre-existing thyroid

16  conditions. Yet Pleus' expert report also draws on numerous other peer-reviewed sources, many of which

17  address the Greer study's alleged shortcomings. For one, Pleus notes that the Greer study was "more

18  conservative" than another experiment which concluded that perchlorate doses of approximately 1,400 ppb

19  given to adult men for two weeks did not inhibit iodine uptake. Pleus Report at 6. Pleus cites another

20  study that noted no changes in thyroid hormone in children who had been exposed to perchlorate in

21

22       [13]   Plaintiffs' authorities are distinguishable. Plaintiffs cite *In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1234 (5th Cir. 1986) for the proposition that an expert "whose opinions are available to the highest bidder have no place testifying in a court of law, before a jury, and with the imprimatur of the trial judge's decision that he is an 'expert.'" However, in *New Orleans*, the Fifth Circuit reversed the district court's admission of expert testimony that it accurately described as "incredible": that an individual would experience eight percent annual pay raises while continuing to pay only five percent income taxes. Thus, *New Orleans* does not illuminate the admissibility of Pleus' opinion. Plaintiffs also cite *National Bank of Commerce v. Dow Chem. Co.*, 965 F. Supp. 1490, 1516 (E.D. Ark. 1996), which involved an expert who had "participated in some 8,000 cases . . . and given some 800 depositions" but equivocated in her opinion when pressed by the court. Pleus' report, on the other hand, has no such uncertainty.

ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW DOH

15

drinking water in concentrations as high as 120 ppb. *Id*. Pleus also comments that a tract in California where residents had been exposed to perchlorate for fifteen years found fewer cases of primary congenital hypothyroidism in newborns than would have been expected in the absence of perchlorate. *Id*. at 13. Finally, Pleus mentions seven other peer reviewed studies that show that newborns and children exposed to perchlroate levels above 100 ppb in water "showed no changes in thyroid hormone levels whatsoever." *Id*. at 34. Of course, an expert report may properly reference other work in the field. *See Metabolife Intern., Inc. v. Wornick,* 264 F.3d 832, 845 (9th Cir. 2001) (reversing district court's refusal to admit expert risk assessor's opinion despite the fact that it was "prepared in anticipation of litigation" because it explained its reasoning and employed data from peer-reviewed articles). Thus, plaintiffs have failed to show that Pleus' testimony is inadmissible.[14]

### C.    Summary Judgment

Summary judgment is proper when there are no genuine issues as to any material fact and the movant is entitled judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). This court must regard as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. *Id*. at 324. Where the moving party does not bear the burden of proof on an issue at trial, it may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).

---

[14]    Plaintiffs also contend that Pleus' testimony is irrelevant because plaintiffs only seek damages for property diminution and mental distress. As explained below, the court disagrees. Plaintiffs' claims for nuisance hinge on the broad-based normative generalization of whether the presence of perchlorate in their groundwater is a "substantial" invasion of their property. Perchlorate's toxic characteristics are relevant for this determination.

ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW DOH

1    **1.    Whether the Dallas and Wess Lack Standing**

2    Olin argues that the Dallas and Wess lack standing to sue because they have not documented

3    perchlorate in concentrations greater than 2.0 ppb in their wells.  Federal jurisdiction under Article III of the

4    United States Constitution extends only to "[c]ases" and "[c]ontroversies."  The standing doctrine ensures

5    that litigants seek to vindicate concrete interests.  To establish standing, a plaintiff must prove that (1) he has

6    suffered an "injury-in-fact": a wrong that is "concrete and particularized" and "actual or imminent, not

7    conjectural or hypothetical"; (2) there is "a causal connection between the injury and the [defendant's]

8    conduct"; and (3) a favorable decision would redress the injury.  *Lujan v. Defenders of Wildlife*, 504

9    U.S. 555, 560 (1992).

10    Olin relies on *Chemical Weapons Working Group, Inc. v. U.S. Dept. of the Army*, 963 F.Supp.

11    1083 (D. Utah 1997) for the proposition that "alleged detections of chemicals at or below regulated . . . or

12    toxicologically significant levels . . . do not equate to actionable harm."  Mot. Summ. J. at 22:21-24.  In

13    *Chemical Weapons Working Group*, the plaintiffs filed a motion for a preliminary injunction to stop the

14    army from incinerating chemical weapons at a base.  The plaintiffs argued that they had detected the

15    presence of a nerve agent in emissions from the base.  The court denied the motion, reasoning that "there

16    has never been a confirmed detection of agent in the stack emissions" because "[n]on-zero values . . . relied

17    upon by plaintiffs were well-below the level of quantification of the monitoring equipment . . . ."  *Id*. at

18    1096.

19    Olin also analogizes to *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability*

20    *Litigation*, 175 F. Supp. 2d 593 (S. D. N. Y. 2001).  In that case, well owners in several states sued a

21    group of petroleum companies for allegedly contaminating groundwater with a gasoline additive.  The

22    companies moved to dismiss claims by plaintiffs whose wells had not been tested for the additive ("non-test

23    plaintiffs") or whose wells did not contain the additive ("non-detect plaintiffs").  The court granted the

24    motion, holding that the non-test and non-detect plaintiffs had not suffered an "injury in fact" because they

25    could not show "clearly impending harm."  *Id*. at 608.

26

27

28    ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW DOH

1   Olin argues that *Chemical Weapons* and *MTBE* together suggest that (1) J-flagged sampling

2   results are indistinguishable from non-detect sampling results and (2) plaintiffs with non-detect sampling

3   results lack standing.  The court disagrees.  Because standing is a threshold issue, a plaintiff need not satisfy

4   its elements "with absolute scientific rigor."  *Public Interest Research Group of New Jersey, Inc. v.*

5   *Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir. 1990).  Indeed, "[t]he purpose of the standing

6   doctrine is to ensure that the plaintiff has a concrete dispute with the defendant, not that the plaintiff will

7   ultimately prevail against the defendant."  *Hall v. Norton*, 266 F.3d 969, 976-77 (9th Cir. 2001).  Thus,

8   plaintiffs' claims for stigma damages and mental distress establish an injury-in-fact because they stem from

9   alleged detections of perchlorate.  *Chemical Weapons* holds only that non-quantifiable emissions "are too

10  speculative" to carry a far heavier burden: a preliminary injunction's requirement of "irreparable harm."

11  *Chemical Weapons*, 963 F. Supp. at 1096.  Similarly, *MTBE* is distinguishable because the "non-detect"

12  results in that case revealed "*no . . . contamination.*"  *MTBE*, 175 F. Supp. 2d at 609 (emphasis in original).

13  Conversely, the Dallas and Wess have introduced evidence that their groundwater contains perchlorate.

14  Although the alleged unreliability of these results may affect their substantive claims, it does not warrant

15  closing the courthouse door.

16          **2.       Whether Mrs. Pereira Lacks Standing**

17          Olin next claims that Mrs. Pereira lacks standing on all claims related to diminution of property

18  values because Mr. Pereira is the sole owner of their house.  Rutter Decl. Exs. EE-1, EE-2.  However,

19  plaintiffs produced evidence that, as of May 12, 2004, the Pereiras owned their home as joint tenants.

20  Pearce Decl. Ex. W.  The court thus rejects Olin's argument.

21          **3.       Trespass**

22          Both plaintiffs and Olin move for summary judgment on plaintiffs' trespass cause of action.  "The

23  essence of the cause of action for trespass is an unauthorized entry onto the land of another."  *Martin*

24  *Marietta Corp. v. Insurance Co. of North America*, 40 Cal. App. 4th 1113, 1132 (1995).  "A trespass

25  is an invasion of the interest in the exclusive possession."  Rest. (Second) Torts § 821D.  "[T]here is no

26  liability for a trespass unless the trespass is intentional, the result of recklessness or negligence, or the result

27

28

of . . . extra-hazardous activity."  *Smith v. Lockheed Propulsion Co.*  247 Cal. App. 2d 774, 784 (1967) (quoting *Gallin v. Poulou*, 140 Cal. App. 2d 638, 645 (1956)).  Plaintiffs argue that the mere presence of perchlorate in their groundwater makes Olin liable.  However, in *San Diego Gas & Electric Co. v. Sup. Court*, 13 Cal. 4th 893, 935-37 (1996), the California Supreme Court held that homeowners who alleged that electric and magnetic fields ("EMFs") omitted from power lines entered their property did not state a cause of action for trespass.  The homeowners claimed that the EMFs (1) rendered their property "unsafe and uninhabitable" and (2) diminished its value.  The court noted that EMFs "are wholly intangible phenomena" because "unlike noise, odors, or light, they cannot be directly perceived by the senses."  *Id*. at 936.  In addition, because plaintiffs merely alleged that their property was unsafe and had declined in value, the court reasoned that they had failed to allege *physical* property damage:

> [P]laintiffs do not allege . . . as they are required to do . . . that the electric and magnetic fields at issue in this case caused any physical damage to their property . . . .  Plaintiffs do allege that the fields in question made their property 'unsafe and uninhabitable.'  But property is 'unsafe and uninhabitable' only to the extent that it creates a risk of personal harm to its occupants, which is manifestly different from damage to the property itself.  Plaintiffs further allege that the electric and magnetic fields on the property will force them to sell it at a substantial loss or abandon it altogether.  A diminution in property value, however, is not a type of physical damage to the property itself, but an element of the measure of damages when such damage is otherwise proved.

*Id*. at 936-37.

*San Diego Gas* relied heavily on *Wilson v. Interlake Steel Co.*, 32 Cal. 3d 229 (1982).  In *Wilson*, homeowners alleged that noise from a steel fabricating plant constituted a trespass because it "made sleep impossible and interfered with the every day use and enjoyment of their property."  *Id*. at 231.  The California Supreme court rejected this contention, reasoning that the noise did not interfere with the homeowners' right to exclusive possession:

> Noise alone, without damage to the property, will not support a tort action for trespass.  Recovery allowed in prior trespass actions predicated upon noise, gas emissions, or vibration intrusions has, in each instance, been predicated upon the deposit of particulate matter upon the plaintiffs' property or on actual physical damage thereto . . . .  All intangible intrusions, such as noise, odor, or light alone, are dealt with as nuisance cases, not trespass.  The emission of sound waves alone, while possibly constituting actionable nuisance, does not support the application of traditional trespass principles.  The highly respected torts authority, Dean Prosser, has noted that:  'The distinction which is now accepted is that trespass is an invasion of the plaintiff's interest in the exclusive possession of his land, while nuisance is an interference with his use and enjoyment of it.'

ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW DOH

19

*Id.* at 233 (quoting Prosser, Torts (4th ed. 1971) § 89, at 594-95) (other citations omitted).

Together, *Wilson* and *San Diego Gas* suggest that imperceptible substances must either (1) "deposit . . . particulate matter upon the plaintiffs' property" or (2) cause "actual physical damage thereto" to constitute a trespass. *See Wilson*, 32 Cal. 3d at 233; *San Diego Gas*, 13 Cal. 4th at 936 (reasoning that EMFs "are wholly intangible phenomena within the meaning of *Wilson*" because they "cannot be directly perceived by the senses").[15] Here, it is undisputed that perchlorate is "colorless, odorless, and would not be detectable by taste" in minute quantities, Pearce Decl. Ex. I at ¶ 18. Because perchlorate "cannot be directly perceived by the senses," plaintiffs must prove that the perchlorate either (1) constitutes the deposit of particulate matter upon their property or (2) has caused physical property damage.

Plaintiffs argue that perchlorate is an ion and has been "deposit[ed]" into their groundwater. Thus, because overlying landowners have "special rights to use groundwater," *City of Barstow v. Mojave Water Agency,* 23 Cal. 4th 1224, 1237 n.7 (2000), plaintiffs contend that Olin has discharged particulate matter onto their property. The flaw in this argument is that plaintiffs do not own the groundwater. Of course, the concept of "property" is comprised of "sticks in [a] bundle of rights." *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994). Plaintiffs' right to use does not equal ownership. *See City of Barstow*, 23 Cal. 4th at 1237 ("overlying water rights are usufructuary only, and while conferring the legal right to use the water that is superior to all other users, confer no right of private ownership"); *AIU Ins. Co. v. Superior Court,* 51 Cal. 3d 807, 818 n.6 (1990) (overlying property owner "cannot be considered the owner" of groundwater). This distinction makes sense in light of the purpose of the trespass cause of action: to protect the right to exclusive possession. Ownership's central feature is the right "to possess and use [a thing] to the exclusion of others." Cal. Civ. Code § 654. Since plaintiffs do not "own" the groundwater, they cannot exclude others from it. To hold that the deposit of particulate matter into a substance that plaintiffs have a non-exclusive right to use amounts to a trespass would extend the trespass doctrine beyond

---

[15]     *San Diego Gas* seems to expand *Wilson*'s holding. *Wilson* referred to "noise, odor, or light" as "intangible intrusions." *Wilson*, 32 Cal. 3d at 233. Of course, noise, odor, and light are perceptible.

ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW DOH

1  its theoretical underpinnings at a time when the California Supreme Court is narrowing the doctrine.

2  Plaintiffs thus cannot show that Olin has deposited particulate matter onto their property in a way that

3  sounds in trespass.

4         Nor can plaintiffs show that Olin has caused physical damage to their property.  Plaintiffs make no

5  claim that their real property, as opposed to their groundwater, has been contaminated by seepage of

6  perchlorate into the soil.  Instead, plaintiffs' allegations are precisely the allegations that *San Diego Gas* held

7  did not constitute claims for physical damage to property: (1) diminution in property values, (2) "loss of the

8  use and enjoyment of their property"; and (3) "inconvenience, discomfort, annoyance, mental suffering, or

9  emotional distress."  Pla.'s Opp. Mot. Summ. J. at 4:22-5:1.  *Cf. San Diego Gas*, 13 Cal. 4th at 936-37

10  (allegations that defendant's conduct had made property "uninhabitable" and caused property values to

11  decline did not state a cause of action for trespass).[16]

12         Plaintiffs claim that numerous cases hold that they need not show property damage to prevail on

13  their trespass claims.  However, plaintiffs' authorities are inapposite because they either (1) involve

14  perceptible intrusions or (2) claims of physical property damage.  *See In re Burbank Environmental*

15  *Litig.*, 42 F. Supp. 2d 976, 984 (C.D. Cal. 1998) (demolition was trespass because it "caused dust and

16  debris to be deposited on plaintiffs' property"); *Newhall Land & Farming Co. v. Sup. Court*, 19 Cal.

17  App. 4th 334, 340 (1993) (contamination stained soil and deposited "heavy metals and other volatiles in

18  the water table beneath the property"); *U.S. v. Imperial Irrigation Dist.*, 799 F. Supp. 1052, 1059 (S.D.

19  Cal. 1992) (property was "significantly inundated by water"); *Elton v. Anheuser-Busch Beverage Group,*

20  *Inc.*, 50 Cal. App. 4th 1301, 1307 (1996) (fire constituted trespass); *Cassinos v. Union Oil Co.*, 14 Cal.

21  App. 4th 1770, 1776 (1993) (trespasser "injected its offsite wastewater into Escolle's reserved mineral

22

23         [16]    Two cases cited by *San Diego Gas* reinforce this conclusion.  *See Maddy v. Vulcan*

24  *Materials Co.*, 737 F. Supp. 1528, 1541 (D. Kan.1990) (granting summary judgment against trespass claim when plaintiffs "[a]t most . . . have merely alleged a general diminution in the value of the property" and thus "failed to demonstrate an injury implicating their right to exclusive possession"); *Bradley v.*

25  *American Smelting & Refining Co.*, 635 F. Supp. 1154, 1157 (W. D. Wash. 1986) (granting summary judgment against trespass claim where plaintiffs "assert[ed] that the value of their property has diminished"

26  as a result of soil contamination because "this sort of evidence can serve only to quantify the magnitude of injury otherwise proven").

27

28  ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S
MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE
TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY
JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
DOH

1   estate"). Plaintiffs' other authorities are ambiguous because of their procedural posture. *See KFC*

2   *Western, Inc. v. Meghrig*, 23 Cal. App. 4th 1167, 1182 (1994) (plaintiff was "entitled to amend to plead

3   a continuing trespass based on the alleged soil contamination of the property"); *Mangini v.*

4   *Aerojet-General Corp.*, 230 Cal. App. 3d 1125, 1141 (1991) (complaint stated cause of action for

5   trespass by alleging that defendant "wrongfully deposit[ed] hazardous substances" on plaintiff's property).

6   Accordingly, because plaintiffs cannot show that the presence of the imperceptible perchlorate ion in their

7   groundwater constitutes (1) the deposit of particulate matter onto their property or (2) physical property

8   damage, the court grants Olin's summary judgment motion and denies plaintiffs' summary judgment motion

9   on plaintiffs' trespass cause of action.[17]

10              **4.      Nuisance**

11       Both plaintiffs and Olin move for summary judgment on plaintiffs' nuisance claims.

12              **a.      Private Nuisance**

13       "Anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to

14   the free use of property, so as to interfere with the comfortable enjoyment of life or property" can be a

15   nuisance. Cal. Civ. Code § 3479. To recover for a nuisance, a plaintiff must prove that (1) "the invasion of

16   th[eir] interest in the use and enjoyment of the land was substantial" and (2) that defendant's conduct was

17   "unreasonable." *San Diego Gas,* 13 Cal. 4th at 938.

18       Plaintiffs argue that they are entitled to summary judgment because the Board declared that Olin's

19   conduct "has created and threatens to create a condition of pollution or nuisance." COA at 1. The court

20   disagrees. Federal courts will give preclusive effect to state agency fact finding when the agency "is acting

21   in a judicial capacity and resolve[s] disputed issues of fact properly before it which the parties have had an

22   adequate opportunity to litigate." *U.S. v. Utah Const. & Min. Co.*, 384 U.S. 394, 422 (1966); *see also*

23   *Resolution Trust Corp. v. Rossmoor Corp.,* 34 Cal. App. 4th 93, 106 (1995) (Board order that

24

25       [17]       Although this may seem harsh, *San Diego Gas* and *Wilson* show that the California
      Supreme Court has decided to treat claims such as plaintiffs' under the rubric of nuisance law. Because the
26    remedies under the trespass and nuisance causes of action are similar, this court's holding does not
      significantly deprive them of their ability to seek redress for Olin's alleged wrongdoing.
27

28    ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S
      MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE
      TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY
      JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
      DOH

1    defendants "caused or permitted" fuel to leak from storage tanks created duty to comply with order but did

2    not establish tort liability); *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster*, 52

3    Cal. App. 4th 1165, 1221 (1997) (Board order not conclusive when plaintiffs "presented no evidence" that

4    the "Board was acting in a judicial capacity").  Here, it is undisputed that the Board was not acting in a

5    judicial capacity when it issued the COAs.  Rutter II Decl. Ex. F ("McClure Decl.") ¶ 3.  In their reply

6    briefing, plaintiffs retreat and claim only that the COAs "constitute detailed, persuasive, and convincing

7    *evidence* of Olin's liability."  Rep. Mot. Summ. J. at 1:23-24 (emphasis in original).  Even so, both prongs

8    of the nuisance test are "question[s] of fact that turns on the circumstances of each case."  *San Diego Gas*,

9    13 Cal. 4th at 938-39.  A reasonable jury could conclude that the perchlorate is at levels below that

10   associated with health problems and there is not a "substantial" interference with plaintiffs' use and

11   enjoyment of their land.  The court denies plaintiffs' summary judgment motion on their nuisance claim.

12          Olin argues that no plaintiff has ever detected perchlorate in levels that could harm their health.  Olin

13   notes that plaintiffs' health expert R. Thomas Zoeller ("Zoeller") admits that "normal healthy adults" do not

14   need to be concerned about perchlorate ingestion:

15          Q:  Dr. Zoeller, has it been your consistent position that normal healthy adults really don't
             have to worry about perchlorate in drinking water?
16          A:  Yes.
             Q:  In fact, you have made the statement to the press quote my focus and my consistent
17          statements have been that normal healthy adults really don't have to worry; is that correct?
             A:  Yes.
18          Q:  That's your opinion you hold today, sir?
             A:  Yes.
19

20   Zoeller Depo. at 113:19-114:4.[18]  Olin asserts that (1) Pleus' opinion is that even infants can safely drink

21   water tainted with perchlorate at far greater concentrations than that in plaintiffs' wells, (2) the NAS Report

22   concluded that consumption of perchlorate in doses of roughly 24.5 ppb for a lifetime is safe for "even the

23   most sensitive populations" (NAS Report at 10) and (3) that the Dallas and Wess have detected

24   perchlorate levels far below the California Public Health Goal of 6 ppb.

25          [18]      Olin also argues that Zoeller testified "that he has no data to suggest that inhibition of iodide
     uptake compromises thyroid hormone synthesis in infants even at levels as high as 50 [ppb]."  Mot. Summ.
26   J. at 14:1-8.  In fact, however, Zoeller testified that no such data exists because such an experiment would
     be far too dangerous.  Zoeller Depo. at 129:8-130:1.
27

28   ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S
     MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE
     TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY
     JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
     DOH

                                                        23

1    Olin analogizes to *San Diego Gas*, 13 Cal. 4th at 937, where the California Supreme Court

2    dismissed a nuisance claim founded on plaintiffs' fear that emissions from powerlines were unsafe.

3    However, *San Diego Gas* based its conclusion on the fact that the Public Utility Commission ("PUC") had

4    already determined that 60 Hz EMFs did not pose a risk of physical harm.  *Id*. at 939.  California courts

5    lack jurisdiction over claims that would interfere with the PUC's regulatory policy.  *Id*. at 912; *see also* Cal.

6    Pub. Util. Code § 1759 ("no court of this state . . . shall have jurisdiction . . . to enjoin, restrain, or interfere

7    with the commission in the performance of its official duties").  Therefore, *San Diego Gas* did *not* hold that

8    plaintiffs' nuisance claims failed on substantive grounds.  Instead, *San Diego Gas* held that permitting the

9    nuisance claim to proceed would risk a jury reaching a result that was inconsistent with the PUC's

10   regulatory findings.  *Id*.  Because the OEHHA—which promulgated the Public Health Goal for

11   perchlorate—has no similar statutory mandate, *San Diego Gas* does not control here.

12   Olin also claims that plaintiffs' nuisance claims must fail because the perchlorate levels in their wells

13   are not "toxicologically significant."  Notably, *San Diego Gas* declined to rule on "whether a fear of future

14   harm will support a cause of action for private nuisance or, if so, whether the fear must be reasonable, *i.e.*,

15   grounded in scientific fact."  *San Diego Gas*, 13 Cal. 4th at 939 (citations omitted).[19]  The court need not

16   decide the issue at this time, however, because plaintiffs have offered evidence from which a reasonable

17   jury could conclude that they have suffered a "substantial" interference with their use and enjoyment of their

18   land.[20]  Plaintiffs may be forced to rely exclusively on bottled water for drinking and cooking for the

19

20       [19]    *Cf. Cook v. Rockwell Intern. Corp.*, 273 F. Supp. 2d 1175, 1202-04 (D. Colo. 2003)
21   (rejecting argument that a "verifiable health risk is required to prove nuisance in cases involving a physical
     intrusion or detrimental change to the property resulting from the presence of contamination there" because
22   "'[i]n determining whether the harm would be suffered by a normal member of the community, fears and
     other mental reactions common to the community are to be taken into account, even though they may be
23   without scientific foundation or other support in fact'") (quoting Rest. (Second) Torts § 821F cmt. f)
     (emphasis omitted).

24       [20]    In addition, Olin's support for the proposition that contamination cannot constitute a
25   nuisance unless it is "toxicologically significant" comes largely from cases where courts rejected nuisance
     claims in the absence of *any* actual contamination.  *See In re Wildewood Litigation*, 52 F.3d 499, 501
26   (4th Cir.1995) ("[t]he drinking water of the plaintiffs . . . [was] not contaminated by the TCE at issue");
     *Rockwell International Corp. v. Wilhite*, 143 S.W.3d 604, 621, 627 (Ky. Ct. App. 2003) (discharge of
27   "minute quantities" of polychlorinated biphenyls (PCBs) onto plaintiffs' properties did not constitute a

28   ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S
     MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE
     TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY
     JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
     DOH

foreseeable future.  For example, plaintiffs' expert hydrologist, Eric Nichols ("Nichols") has stated that it will

"take several decades to possibly hundreds of years" for Olin to remedy the situation.  Pearce Decl. Ex. JJ

at 14.  The EPA has also opined that remediation may take 30 to 40 years.  Pearce Decl. Ex. LL.   Of

course, water plays a vital role in many domestic activities.  A reasonable jury could find that being unable

to use tap water for so long will cause plaintiffs "substantial" annoyance and discomfort.[21]  Olin argues that

two courts have held that being forced to use bottled water is not a "substantial" interference with property.

However, one such case, *O'Neal v. Dept. of Army*, 852 F. Supp. 327, 337 (M.D. Pa. 1994), actually

held that plaintiffs had failed to prove that the conduct that caused the alleged nuisance "was

---

nuisance where "there was testimony presented [that] PCBs are present in minuscule amounts on nearly every piece of property wherever located"); *Adkins v. Thomas Solvent Corp.*, 487 N.W.2d 715, 721 (Mich. 1992) ("no contamination had reached or would reach the well water of the plaintiffs"); *Adams v. Star Enterprise*, 851 F. Supp. 770, 774 (E.D. Va. 1994)("plaintiffs have not alleged any actual or imminent physical impact on themselves or their properties from the pollutants").  These cases are better explained as applications of the principle '*damnum absque injuria*—a loss without an injury, in the legal sense." *Adkins*, 487 N.W.2d at 724.  Here, the impairment of plaintiffs' right to use their property stems from the actual physical impact of the perchlorate on their groundwater.  As such, they have stated a legally-cognizable injury.  *See California Dept. of Toxic Substances Control v. Payless Cleaners, College Cleaners*, 368 F. Supp. 2d 1069, 1084 (E.D. Cal. 2005) (actual contamination satisfies physical injury requirement).

Olin also cites *Collier v. Simpson Paper Co.*, 1996 U.S. Dist. LEXIS 20102 (E.D. Cal. 1996), which, at first blush, seems to bolster its position in regard to the Dallas and Wess.  Plaintiffs in *Collier* claimed that defendant's dioxins had infiltrated their water.  For support, they noted two J-flagged test results.  The court held that the J-flagged results were insufficient to create a genuine issue of material fact on plaintiffs' negligence, trespass, and nuisance causes of action.  *Id.* at *8-*24.  However, *Collier* reached this conclusion largely because plaintiffs' expert, who opined that the J-flagged values represented trace levels of dioxin, was utterly unfamiliar with EPA Method 1613, which detects dioxins.  *Id.* at *10.  Plaintiffs in *Collier* also had no other evidence of contamination.  *Id.* at *12.  Here, conversely, plaintiffs have Lane's testimony as to the meaning of the J-flagged values.

[21]      However, California courts are in conflict on whether damages for emotional distress can flow from a private nuisance.  *Compare Baker v. Burbank-Glendale-Pasadena Airport Auth.*, 220 Cal. App. 3d 1602, 1610 (1990) ("emotional distress damages are available only in actions based on public nuisance") *and Institoris v. City of Los Angeles*, 210 Cal. App. 3d 10, 21 (1989) ("[e]motional distress damages, as a personal injury, are not available in an action on a private nuisance") *with Acadia, California, Ltd. v. Herbert*, 54 Cal. 2d 328, 337 (1960) ("[i]t is settled that, regardless of whether the occupant of land has sustained physical injury, he may recover damages for the discomfort and annoyance of himself and the members of his family and for mental suffering occasioned by fear for the safety of himself and his family when such discomfort or suffering has been proximately caused by a . . . nuisance") *and Smith v. County of Los Angeles,* 214 Cal. App. 3d 266, 288 (1989) ("mental distress caused by the nuisance created and maintained by the defendant is an element of loss of enjoyment") (citation omitted) *and Koll-Irvine*, 24 Cal. App. 4th at 1042 n.3 (1994) ("[d]amages for emotional distress can be recovered in an action for private nuisance").

ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
DOH

25

1   'unreasonable'": a different prong of the private nuisance test.  The other case, a decision of the

2   Massachusetts Superior Court, involved the contamination of a single, non-residential property.  *See*

3   *Gleason v. Town of Bolton*, 2002 WL 1555320 *3 (Mass. Super. 2002).[22]  Because the substantial

4   interference inquiry "is, of course, a question of fact that turns on the circumstances of each case," *San*

5   *Diego Gas*, 13 Cal. 4th at 938, the court denies Olin's motion for summary judgment on plaintiffs' nuisance

6   cause of action.[23]

7                        **b.        Public Nuisance**

8            A public nuisance "affects at the same time an entire community or neighborhood, or any

9   considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals

10  may be unequal."  Cal. Civ. Code § 3480.  A private party can only state a claim for public nuisance if he

11  proves "damages different in kind and not merely in degree" from that suffered by other affected members

12  of the community.  *See Koll-Irvine*, 24 Cal. App. 4th at 1040-41 (dismissing public nuisance claim

13  founded on fear that fuel tanks would explode when all members of the community shared same fear); *In re*

14  *Burbank Environmental Litig.*, 42 F. Supp. 2d at 984 (dismissing public nuisance claim stemming from

15  allegations that defendant's demolition spread dust and debris throughout the neighborhood because "[n]one

16  of plaintiffs' allegations of interference with their property are in any way different from the interference that

17  the general population allegedly suffered").  Here, all San Martin residents in the affected area have

18  allegedly suffered from diminished property values, discomfort, and annoyance.  Thus, because plaintiffs'

19  purported damages do not differ in kind from other members of their community, the court grants Olin's

20  motion for summary judgment and denies plaintiffs' motion for summary judgment on plaintiffs' public

21  nuisance claim.

22  _____

23      [22]      Olin claims, without any citation to authority, that the Pereiras cannot state a claim for
    nuisance because Olin has offered to install ion exchange technology in their houses.  McClure Decl.  ¶¶ 2-
24  3.  While this may certainly bear on the Pereiras' efforts to mitigate their damages, the court does not
    believe it impacts their substantive claims.

25      [23]      At oral argument, Olin contended that the Dallas and Wess no longer qualify for free
    bottled water from the SCVWD.  Thus, Olin argued, the Dallas and Wess' voluntary choice, not Olin's
26  alleged wrongdoing, has caused any annoyance and discomfort that they have suffered.  However, factual
    issues remain as to whether the SCVWD initially ordered the Dallas and Wess to stop using tap water.

27
    ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S
28  MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE
    TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY
    JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
    DOH

### 5.   Negligence *Per Se*

Both plaintiffs and Olin move for summary judgment on plaintiffs' negligence *per se* claims.  The doctrine of negligence *per se* provides a rebuttable presumption that a defendant is negligent if (1) the defendant violates a statute, (2) the defendant's violation proximately causes injury to the plaintiff, (3) the injury "resulted from an occurrence of the nature which the statute . . . was designed to prevent," and (4) the plaintiff "was one of the class of persons for whose protection the statute was adopted."  Cal. Evid. Code § 669.

Plaintiffs argue that the Board determined that Olin violated California Water Code § 13304.  Plaintiffs also contend that because the Board found (1) that Olin discharged perchlorate and (2) that "perchlorate is a waste," Olin violated California Health and Safety Code § 13050, which prohibits the "discharge . . . [of] waste."  However, it is for "the jury to decide the statutory violation and causation issues."  *DiRosa v. Showa Denko K.K.*, 44 Cal. App. 4th 799, 807-08 (1996).  Because the Board's findings are not entitled to preclusive effect, the court determines that fact issues remain as to whether Olin's conduct violated the statutes noted above or caused plaintiffs' harm.  Thus, the court denies plaintiffs' motion for summary judgment on their negligence *per se* cause of action.

Olin notes that a defendant can rebut the presumption of negligence *per se* by proving that the defendant "did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law."  Cal. Evid. Code § 669(b)(1).  Olin argues that the Board, DHS, and EPA all concluded that Olin's operations were "not threatening state waters" from 1979 to 1989.  Rutter Decl. Ex. F. at 1-5, 6-2.  In addition, Olin argues that perchlorate was not a "constituent of regulatory concern . . . in connection with groundwater" during this time.  Mot. Summ. J. at 34:13-17.  Olin's argument is flawed.  Despite the Board, DHS, and EPA's determinations, it is undisputed that perchlorate entered the groundwater.  A reasonable jury could conclude that this occurred as a result of a statutory violation.  Moreover, Olin cites no authority for the proposition that violation of statutes relating to matters that do not rise to the level of "regulatory concern" cannot constitute negligence *per se*.  The court thus rejects Olin's motion for summary judgment on plaintiffs' negligence *per se* claims.

ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW DOH

27

1

### 6. Negligence

2        Olin argues that it is entitled to summary judgment on plaintiffs' negligence cause of action.  To state

3 a *prima facie* case of negligence, plaintiffs must show that defendants (1) owed them a duty, (2) breached

4 that duty, (3) that the breach was the but-for and (4) proximate cause of their injuries, and (5) that they

5 suffered damage.  *See, e.g., Wiener v. Southcoast Childcare Centers, Inc.*, 32 Cal. 4th 1138, 1142

6 (2004).  Olin claims that plaintiffs cannot show that Olin's alleged breach of duty caused their harm.  For

7 support, Olin cites *Adams*, 851 F. Supp. at 774, which held that plaintiffs whose properties had not been

8 contaminated could not prove that the defendant caused a diminution in property values, as "[t]he harm

9 complained about, that is the diminution in property values, is a result of third-party fears about the

10 contamination, not the contamination itself."  However, as mentioned, *Adams* involved uncontaminated

11 property.  *See id*. at 774 ("plaintiffs have not alleged any actual or imminent physical impact on themselves

12 or their properties from the pollutants").  Moreover, "the general test of whether an independent intervening

13 act, which operates to produce an injury, breaks the chain of causation is the foreseeability of that act."

14 *Hardison v. Bushnell*, 18 Cal. App. 4th 22, 27 (1993).  Generally, "foreseeability is a question of fact for

15 the jury . . . ."  *Bigbee v. Pacific Tel. & Tel. Co.*, 34 Cal. 3d 49, 56 (1983).  The court cannot hold as a

16 matter of law that it is unforeseeable that third parties would be apprehensive of property which uses

17 groundwater that is *actually* contaminated.  Thus, the court denies Olin's motion on plaintiffs' negligence

18 cause of action.

19

### 7. Strict Liability for Ultra Hazardous Activity

20        Olin moves for summary judgment on plaintiffs' strict liability for ultra hazardous activity cause of

21 action.  The court must determine whether a particular activity is ultra hazardous and subject to strict

22 liability by weighing six factors:

23        (a) existence of a high degree of risk of some harm to the person, land or chattels of
others; (b) likelihood that the harm that results from it will be great; (c) inability to

24 eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is
not a matter of common usage; (e) inappropriateness of the activity to the place where

25 it is carried on; and (f) extent to which its value to the community is outweighed by its
dangerous attributes

26

27

28 ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S
MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE
TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY
JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
DOH

1  *In re Burbank Environmental Litig.*, 42 F. Supp.2d at 983(quoting Rest. (Second) Torts § 520).  The

2  point of strict liability is to allocate inevitable loss.  Thus, "[w]here the activity is dangerous only if insufficient

3  care is exercised, ordinary rules of fault are sufficient for allocation of the risk.  There is no need for liability

4  without proof of fault, because definitionally if there is damage it will have resulted from negligence and will

5  be compensable." *Edwards v. Post Transportation Co.*, 228 Cal. App. 3d 980, 987 (1991).  Here,

6  plaintiffs fail to show that Olin's operations were so dangerous or so ill-suited for their location that injuries

7  were certain to result.  *See In re Burbank Environmental Litig.*, 42 F. Supp. 2d at 983 (declining to

8  apply strict liability to defendants' use of chemicals to clean metal parts because "[i]f defendant had been

9  aware of the proper storage and disposal process for these chemicals to avoid injury to the environment,

10  the alleged injuries in this case would likely not have occurred").  Indeed, not only is it possible that

11  perchlorate can be used safely, but the parties dispute the levels at which perchlorate is actually harmful.

12  Also, the area around the plant was zoned for light industrial use.  The court thus grants Olin's motion for

13  summary judgment.

14                    **8.    CERCLA Claims**

15            Plaintiffs seek to recover "necessary response costs, including costs to assess and investigate the

16  nature and extent of the contamination" and expert and attorney's fees under CERCLA.  Wess Compl. ¶¶

17  94, Rutter Decl. Ex. B.  Plaintiffs also seek a declaratory judgment that they are entitled to such costs in the

18  future.  *Id.* ¶ 99.  CERCLA section 107(a)(2)(B), 42 U.S.C. § 9607, allows private parties to recover for

19  "response costs" if they prove that (1) defendant is covered by the statute, (2) there has been or will be a

20  release of a hazardous substance, (3) the release caused plaintiff to incur cleanup and response costs, (4)

21  the costs were necessary, and (5) the costs were consistent with the national contingency plan ("NCP").

22  *See Casaic Lake Water Agency v. Whittaker Corp.*, 272 F. Supp. 2d 1053, 1059 (C.D. Cal. 2003).

23            Olin argues that plaintiffs' CERCLA claims should be dismissed because plaintiffs have violated two

24  case management orders.  Federal Rule of Civil Procedure 37(b)(2)(B) permits courts to "refus[e] to allow

25  . . . part[ies] to support or oppose designated claims" as a sanction for "fail[ing] to obey an order to

26  provide or permit discovery."  Olin contends that on October 27, 2003, the court required plaintiffs to

27

28  ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S
MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE
TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY
JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
DOH

1    serve initial disclosures that included "'back up' for any other out of pocket expenses or damages claimed to

2    be at issue in the lawsuit (*e.g.*, bills for bottled water or clean up costs incurred by plaintiffs)."  Rutter Decl.

3    Ex. C at 26.  Plaintiffs' initial disclosures included no such "back up."  *Id*. Ex. D.  On March 5, 2004, the

4    court entered another case management order that required plaintiffs to provide "supporting documentation

5    for their damages claims."  *Id*. Ex. E.  Olin claims that plaintiffs eventually produced cryptic, single-page

6    statements that claimed amounts paid for "Environmental Consultants," "Drinking Water Testing and

7    Analysis," and "Replacement Drinking Water."  *Id*. Ex. F.[24]  Olin argues that plaintiffs' failure to comply is

8    especially egregious because it had previously served a request for production of "back up" for CERCLA

9    response costs.  *Id*. Ex. G.

10         Dismissal of a cause of action for a violation of this nature, of course, is a drastic remedy.  Olin cites

11   no case where such a request has been granted.  In addition, plaintiffs contend that they produced in

12   discovery a document that shows that the Pereiras hired a consultant to analyze their water in January

13   2003.  Franco Decl. Ex. H.  Plaintiffs also claim that Cindy Dalla alluded to her use of bottled water during

14   her deposition.  The court will permit plaintiffs to testify from their firsthand knowledge about how much

15   they spent on bottled water.  However, the court will reject any attempt to bolster this testimony with

16   documentary evidence such as receipts that were not timely disclosed.

17         Olin also argues that plaintiffs cannot prove that their claimed response costs were "necessary."

18   Olin relies on *Louisiana-Pacific Corp. v. Beazer Materials & Servs.*, 811 F. Supp. 1421 (E.D. Cal.

19   1993).  In that case, the plaintiff "proceeded with its own unauthorized investigation" after "the EPA

20   explicitly informed [it] of its intent to conduct [the EPA's own] investigation."  *Id*. at 1425.  The court held

21   that response costs incurred after the EPA gave the plaintiff notice were not "necessary."  *Id*. at 1426.  Olin

22   contends that the Pereiras' water testing cannot have been "necessary" because the SCVWD "Fact Sheets"

23   provides a number for residents to call for "free well-testing."  Franco Decl. Ex. D.  Yet the Fact Sheet is

24

25

---

26         [24]     Both bottled water and well-testing are permissible response costs.  *See* 42 U.S.C.
     9601(23), (24).

27

28   ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S
     MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE
     TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY
     JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
     DOH

1    from September 2003; the Pereiras' testing was done in January 2003.  *Id*. Ex. H.  Because Olin cannot

2    prove that free well-testing was available in January 2003, its claim fails.

3         Olin next claims that plaintiffs' response costs were not consistent with the NCP.  However, it is

4    well-established that "the detailed NCP provisions governing other response action cannot reasonably be

5    applied to preliminary monitoring and evaluation of a release of hazardous substances."  *Marriott Corp. v.*

6    *Simkins Indus., Inc.*, 825 F.Supp. 1575, 1583 (S.D. Fla. 1993) (quoting *Artesian Water Co. v. New*

7    *Castle County*, 659 F.Supp. 1269, 1294 (D. Del. 1987)).  Thus, investigatory costs are generally

8    recoverable irrespective of their consistency with the NCP.  *See also Bowen Engineering v. Estate of*

9    *Reeve*, 799 F.Supp. 467, 477 (D. N.J. 1992); *Carlyle Piermont Corp. v. Federal Paper Bd. Co.*, 742

10   F.Supp. 814, 821 (S.D. N.Y. 1990); *Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 934 (6th

11   Cir. 2004).[25]  Because plaintiffs' claimed response costs stem from "preliminary monitoring and evaluation,"

12   Olin's argument is unconvincing.[26]

13        Finally, Olin contends that plaintiffs' request for attorney's fees contravenes the Supreme Court's

14   decision in *Key Tronic Corp v. United States*, 511 U.S. 809, 819 (1994) (holding that, with limited

15   exceptions, attorney's fees are not recoverable under CERCLA).  Olin is correct.  The court dismisses

16   plaintiffs' request for attorney's fees on the CERCLA claims.

---

22        [25]    Olin correctly observes that nothing in CERCLA mandates such a result.  Nevertheless, Olin cites no contradictory authority.

23        [26]    *Young v. U.S.*, 394 F.3d 858 (10th Cir. 2005) is not to the contrary.  In that case, the Tenth Circuit held that plaintiffs' "hir[ing] an environmental consulting company to conduct an 'abbreviated' site investigation, and . . . an environmental hydrology and engineering company to assess the potential risks to humans who worked on their property" were neither "necessary" nor "consistent with the NCP."  *Id*. at 864.  However, unlike here, plaintiffs in *Young* had "abandoned their property and d[id] not intend to spend any money to cleanup the contamination."  *Id*. at 862.  The Tenth Circuit noted that the "costs [were] incurred solely for litigation."  *Id*. at 865.  Here, there is at least a factual issue as to whether the Pereira's January 2003 well-testing and the other plaintiffs' bottled water were necessary.

ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
DOH

**III.  ORDER**

For the foregoing reasons, the court grants and denies plaintiffs' and Olin's motions as follows:

1.  The court grants plaintiffs' evidentiary objections in part and denies them in part as noted.

2.  The court denies Olin's motion to exclude Lane's testimony

3.  The court denies plaintiffs' motion to exclude Pleus' testimony.

4.  The court denies plaintiffs' motion for summary judgment.

5.  The court grants Olin's motion for summary judgment on plaintiffs' trespass, public nuisance, and strict liability claims as to all plaintiffs and denies Olin's motion on plaintiffs' negligence, negligence *per se*, and private nuisance claims as to all plaintiffs.

6.  The court denies Olin's motion for summary judgment on plaintiffs' CERCLA claims with the exception of plaintiffs' request for attorney's fees.

DATED:　　　6/24/05　　　　　　　　　　　　　　/s/ Ronald M. Whyte

RONALD M. WHYTE
United States District Judge

ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
DOH

32

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiffs:**

| | |
|---|---|
| Colin L. Pearce | clpearce@duanemorris.com |
| M. Elizabeth Graham | meg@rapazzinigraham.com |
| Richard M. Franco | rmfranco@duanemorris.com |
| Mark P. Rapazzini | mpr@rapazzinigraham.com |
| Timothy W. Moppin | twmoppin@duanemorris.com |
| Matthew Kliszewski | mkkliszewski@duanemorris.com |

**Counsel for Olin:**

| | |
|---|---|
| Randall C. Creech | rcreech@sjlegal.com |
| Keith M. Casto | keith.casto@sdma.com |
| Adam E. Miller | adam.miller@husch.com |
| Carol A. Rutter | carol.rutter@husch.com |

**Counsel for Standard Fusee:**

| | |
|---|---|
| Earl L. Hagstrom | earl.hagstrom@sdma.com |
| Gary A. Sloboda | gary.sloboda@sdma.com |

**Counsel for Interested Party:**

| | |
|---|---|
| Richard Alexander | amostek@alexanderlaw.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**      6/24/05                          DOH

**Chambers of Judge Whyte**

ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EVIDENTIARY OBJECTIONS, (2) DENYING OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF STEVEN LANE, (3) DENYING PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF RICHARD PLEUS, (4) GRANTING IN PART AND DENYING IN PART OLIN'S MOTION FOR SUMMARY JUDGMENT, AND (5) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT-03-01607-RMW
DOH