E-FILED on    7/5/05

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JAYNE PALMISANO and RICHARD PALMISANO, individuals,<br><br>Plaintiff,<br><br>v.<br><br>OLIN CORPORATION, a corporation, STANDARD FUSEE CORPORATION, doing business as ORION SAFETY PRODUCTS, a Delaware corporation, and DOES 1 through 50,<br><br>Defendants. | No. C-03-01607 RMW<br><br>ORDER GRANTING IN PART AND DENYING IN PART OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF JOHN KILPATRICK<br><br>[Re Docket No. 85] |
| AND ALL RELATED CASES | |

Olin Corporation ("Olin") moves to exclude the testimony of John Kilpatrick ("Kilpatrick"), plaintiffs' property diminution expert. The court has read the moving and responding papers and considered the arguments of counsel. For the reasons set forth below, the court grants Olin's motion to the extent Kilpatrick opines that the fair market values of properties sold after the perchlorate announcement in 2003 must be discounted because the buyers, despite the fact that the market was saturated with information about the perchlorate problem, nevertheless paid more for their properties than they were

ORDER GRANTING IN PART AND DENYING IN PART OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF JOHN KILPATRICK—C-03-01607-RMW
DOH

actually worth. The motion is otherwise denied as Olin's criticism of other aspects of Kilpatrick's opinion go to weight rather than admissibility.

## I. BACKGROUND

Kilpatrick, an appraiser, attempts to calculate the effect of the perchlorate on the present market value of plaintiffs' homes. Kilpatrick's general method for valuing plaintiffs' loss is an intuitive-seeming formula:

> value unimpaired - value impaired = diminution in value

Kilpatrick Report at 17. The unimpaired value aspect of Kilpatrick's opinion is relatively straight forward. Kilpatrick determined that, as of January 16, 2003, the date on which authorities in San Martin held a press conference to alert the public to the presence of perchlorate in their water, (1) the Dallas' home was worth $665,000, (2) the Pereiras' home was worth $800,000, (3) the Smiths' home was worth $1,350,000, and (4) Wess' home was worth $735,000. *Id*. at 23.

Kilpatrick's method for determining the impaired value is more complicated. Kilpatrick begins by explaining that there is a subtle distinction between market prices and market value. According to Kilpatrick, the Appraisal Institute's most recent definition of market value is "[t]he most probable price" at which a property will likely sell assuming, *inter alia*, that (1) "[t]he buyer and seller and are each acting prudently and knowledgeably" and (2) "[a]n open and competitive market exists for the property interest appraised." *Id*. at 36. However, Kilpatrick claims, because these assumptions are rarely true, prices often do not reflect true market value:

> In real estate markets, information is absorbed slowly over time, and thus at any point in time market participants do not have complete information relative to value. If the information would result in a significant shift in market values, this temporal diffusion problem can result in prices which are substantially different from true market values.

*Id*. at 39. Kilpatrick argues that this disconnect between prices and market value is especially acute in situations such as San Martin[1] because "it often takes a period of years for information about contamination to be fully diffused in a market." *Id*. at 46.

---

[1] Kilpatrick analyzed a "subject area" where "most of the groundwater testing for perchlorate has occurred," which included San Martin as well as portions of unincorporated Morgan Hill and Gilroy. Kilpatrick Report at 11. For simplicity's sake, the court will refer to the "subject area" as San Martin and the areas that were not affected by the perchlorate as Morgan Hill and Gilroy.

ORDER GRANTING IN PART AND DENYING IN PART OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF JOHN KILPATRICK—C-03-01607-RMW
DOH

Kilpatrick notes that perchlorate announcement in January 2003 "had a fairly immediate affect [sic] on the real estate market." *Id*. at 58. Kilpatrick explains that unlike surrounding towns, which experienced modest growth in sales activity, home sales in San Martin declined by two percent. *Id*. To quantify the present value diminution in plaintiffs' properties, Kilpatrick employed a technique called "comparable market sales analysis." Within this analysis are two separate empirical models: the "repeat sales" and "matched pairs" methods. *Id*. at 59. The repeat sales method involves first calculating the average annual appreciation rate ("AAR") of plaintiffs' properties. *Id*. Kilpatrick analyzed the growth rate of properties that were sold twice after 1990 and had been occupied by the sellers for an average of six years. *Id*. By adding together the average appreciation rates of these houses beginning in 1999 and through 2002 and then dividing by four, Kilpatrick concluded that they were appreciating at an average of 11.6% per year. Kilpatrick Depo. at 58:11-18. Yet this rate fell to 8.41% in 2003 and 7.26% in the first quarter of 2004. Kilpatrick Report at 59. Kilpatrick projected this 7.26% rate forward and determined that, based on this lost appreciation, plaintiffs' current property values have declined (1) by 37.5% if the perchlorate problem lasts forever and (2) by 32.85% if the perchlorate problem can be remedied within ten years. *Id*. at 60. In January 2005, Kilpatrick updated this data to show a (1) perpetuity diminution of 31.24% and (2) a ten-year diminution of 28.46%. Kilpatrick Supplemental Report, Miller Decl. Ex. E at 6-7.

Kilpatrick then used the matched pairs method, comparing the value of twenty properties that sold in San Martin in 2002 with similar properties that sold after the perchlorate announcement in 2003. Kilpatrick Report at 61. Kilpatrick adjusted values to account for differences in dwelling size and other amenities between "matched" properties. *Id*. at 62. In addition, because Kilpatrick believed that properties sold in 2002 would have continued to appreciate at a rate of 12% in 2003 in the absence of perchlorate, he added 12% to their 2002 sale price. *Id*. Comparing the two prices, Kilpatrick determined that "post announcement properties have sold for between 2.7% and 26.3% less than comparable pre-announcement properties, with an overall average and median difference of negative 12.5% and 13.7%, respectively." *Id*. at 63.[2] In sum, Kilpatrick opines that "home values fell immediately after the

---

[2] Kilpatrick also noted that higher-priced homes appear to be lose a greater percentage of their value than lower-priced homes. *Id*. at 63.

ORDER GRANTING IN PART AND DENYING IN PART OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF JOHN KILPATRICK—C-03-01607-RMW
DOH

announcement and while they continue to grow, are growing at rates significantly below what the owners had previously expected." *Id*.

Kilpatrick claims that he bolstered his findings with a survey of buyers of San Martin homes after the perchlorate announcement. *Id*. at 66. Kilpatrick asserts that the buyer's survey is important for three reasons:

> First, it aids us in determining causality. The survey research very specifically links the empirically observed property value declines with the contamination problem. Second, the quantitative results of the survey research, particularly the perceived diminution results, are consistent with and supportive of the other empirical findings in San Martin. Finally, the survey research demonstrates that the contamination reactions in San Martin are fundamentally consistent with our findings in other markets determined by other surveys over the past three decades, allowing us to generalize those findings to the specific San Martin case.

*Id*. Kilpatrick notes that (1) 94% of respondents "indicated they were aware of some general environmental conditions, and most were specifically aware of the perchlorate or 'water contamination,'" (2) 79% received information about groundwater conditions from a real estate agent or seller, (3) 41% received this information when they first saw the property while 37% received it after consummating the sale, and (4) "[m]ost people were aware that their well had been tested, but many discovered the results of the well tests after purchasing the property." *Id*. at 67. Kilpatrick then gave respondents a statement "summarizing some facts about the source and extent of the perchlorate contamination, known health effects of perchlorate, and several proposed remedies." *Id*. Half of the respondents claimed to know "most" of this information already. *Id*. at 68. About a third claimed to know "some" of it. *Id*. Although 56% felt that the amount of information in the statement was adequate for making a home-buying decision, 44% wanted to know more. *Id*. From this, Kilpatrick concluded that "a very significant number of buyers lacked an adequate level of information from which to make a prudent and knowledgeable decision regarding the groundwater conditions." *Id*. According to Kilpatrick, this evidence supports his thesis that "sales in the market are at artificially high prices" and do not reflect the inevitable decline that will occur as information about perchlorate spreads. *Id*. at 69.

Kilpatrick concludes that the present value of (1) the Dallas' home has declined in value 29.53%, from $665,000 to $468,626, for a total diminution of $196,375, (2) the Pereiras' home has declined 34.81%, from $800,000 to $521,520, for a diminution of $278,400, (3) the Smiths' home has declined

ORDER GRANTING IN PART AND DENYING IN PART OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF JOHN KILPATRICK—C-03-01607-RMW
DOH

1  50%, from $1,350,000 to $675,000, for a diminution of $675,000, and (4) Wess' home has declined
2  32.27%, from $735,000 to $497,816, for a diminution of $237,185. *Id*. at 72.

## II. ANALYSIS

### A. Legal Standard

Federal Rule of Evidence 702 provides that courts may admit expert testimony if it is both relevant and reliable:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*See also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993) (proponent of expert testimony must prove admissibility by a preponderance of the evidence). To determine whether an expert's proposed testimony is reliable, a trial judge may consider (1) whether it can be tested or whether it is purely subjective; (2) whether it has been subject to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of controls; and (5) whether it has been generally accepted in the scientific community. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-50 (1999).

### B. The Court Excludes Kilpatrick's Testimony to the Extent it Incorporates Plaintiffs' Alleged "Lost" Future Appreciation into the Present Value of Their Homes

An important "consideration under Rule 702 . . . is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 592 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). Kilpatrick's testimony is relevant because plaintiffs currently have viable claims for permanent nuisance against Olin. California courts recognize two types of nuisances: continuing and permanent. The measure of damages for "continuing nuisance [is] abatement and loss of use." *F.D.I.C. v. Jackson-Shaw Partners No. 46, Ltd.*, 850 F. Supp. 839, 844 (N.D. Cal. 1994). However, "[i]n an action on a permanent nuisance, the plaintiff will be permitted to recover both past and prospective damages." *Beck Development Co. v. Southern Pacific Transportation Co.*, 44 Cal. App. 4th 1160, 1216 (1996). "Prospective damages" are not measured by the amount it will take to compensate a plaintiff in the future for injuries that are likely to occur

ORDER GRANTING IN PART AND DENYING IN PART OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF JOHN KILPATRICK—C-03-01607-RMW
DOH

then. Instead, "prospective damages" compensate a plaintiff for the present-day loss that the prospect of these future injuries have *already* caused:

> [W]hen the wrong is a continuing one, . . . the normal remedy is to recover for harm flowing from the past invasions . . . . [However,] when it appears that the wrong will probably continue indefinitely, the person injured is empowered to elect to be compensated once and for all, for the prospective invasions. This is usually fined at the depreciation in the salable value of the land, as contrasted with damages for past invasions of which the main item is usually the loss of the value of the use or the loss of rental value during some past period . . . . Normally this will be gauged by calculating how much less a reasonable purchaser would give for the land because of the prospect that the land would be subjected to the invasions permanently or for an indefinite time in the future.

Restatement (Second) Torts § 930, comm. a-c.[3]  Thus, Kilpatrick's opinion is relevant only to the extent that it establishes how much the present market value of plaintiffs' homes has decreased because of the perchlorate.[4]

However, Kilpatrick devotes the vast majority of his opinion to explaining why he believes that plaintiffs will suffer losses in the future. Kilpatrick first determines that plaintiffs' homes will appreciate at 7.26% instead of 11.6%. *Id*. at 60. Kilpatrick then calculates the percentage of appreciation plaintiffs' will "lose" assuming either that the perchlorate problem persists forever or lasts ten years:

> In the perpetuity case, the diminution in value, $dp$, as a percentage, is a simple ratio:
> $$dp = 1 - \frac{0.0726}{0.116}$$
> $$= 37.5\%.$$
> The 10-year diminution, $d_{10}$, is determined by taking the difference in the compound sum of a dollar invested for 10-years at the unimpaired growth rate minus the compound of a by [sic] that same dollar invested at the impaired growth rate (7.26%)[:] . . .
> $$d_{10} = \frac{1.116^{10} - 1.0726^{10}}{1.116^{10}}$$
> $$= 32.85\%.$$

*Id*. at 60. Kilpatrick then summarizes his findings:

---

[3] The California Supreme Court has cited Restatement (Second) of Torts § 930 with approval. *See, e.g., Spaulding v. Cameron*, 38 Cal. 2d 265, 269 (1952) (citing the Restatement for the proposition that the proper measure of damages in a permanent nuisance case is "diminution in the market value caused by the probable continuation of the nuisance"); *Baker v. Burbank-Glendale-Pasadena Airport Authority*, 39 Cal. 3d 862, 870 (1985). Thus, the court believes that the California Supreme Court would follow the Restatement.

[4] Plaintiffs cannot recover both for a diminution in present market value and for a future decline in their appreciation rates. Because the present value of their homes already reflects anticipated appreciation rates, permitting them to do so would award them a double recovery.

ORDER GRANTING IN PART AND DENYING IN PART OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF JOHN KILPATRICK—C-03-01607-RMW
DOH

> [P]rice decline trends continue, and based on the early data it appears that the present value of the long-term impact will be in the range of 35% at the mean. Additionally, there is evidence that the higher priced homes are impacted roughly twice as severely as the mean, while lower-priced homes are roughly half that of the mean. This suggests long-term equilibrium value impacts for the upper quartile of homes at nearly 70% and at the lower quartile of homes at roughly 18% . . . . [T]he distribution of property values in the San Martin market is not linear, but in fact exponential at the higher end of the range. To compensate for this, [I] . . . capp[ed] the diminution at 50% . . . for internal consistency.

*Id*. at 71. But Kilpatrick never meaningfully relates plaintiffs' future "loss" to the *present* value of their properties. Indeed, Kilpatrick simply declares—with no explanation whatsoever—that "the present value of the long-term impact will be in the range of 35% of the mean." *Id*. Kilpatrick's conclusion that homes will appreciate at 37.5% less in perpetuity and 32.85% less over the course of ten years does not translate into a present-value diminution of 35%. Kilpatrick also does not indicate how he arrives at his final decision that the Dallas' home has diminished in value 29.53%, the Pereiras' home has diminished in value 34.81%, the Smiths' home has diminished in value 50%, and Wess' home has diminished in value 32.27%. *Id*. at 72. Thus, Kilpatrick improperly fails to link his analysis to the relevant issue. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (holding that courts may also exclude testimony when experts "fai[l] to explain the basis for their conclusions").

Moreover, Kilpatrick's expert report provides little support for its premise that the present value of plaintiffs' properties has sharply declined even if the prices that buyers are currently willing to pay for them has not. Kilpatrick notes that the definition of market value assumes that "[t]he buyer and seller are each acting prudently and knowledgeably." Kilpatrick Report at 36. Kilpatrick asserts that prices do not reflect value because buyers are not acting "knowledgeably." Kilpatrick claims that if buyers understood that prices will fall as news of the contamination spreads, they would pay less for houses now.[5] Yet Kilpatrick's

---

[5] The court has serious concerns with the degree of speculation Kilpatrick's theory entails. If plaintiffs could recover for a decline in value that had not yet been reflected in prices, they could sell their homes immediately and receive a windfall: damages for as-yet realized diminution in value plus the full market price. It is true, as plaintiffs claim, that courts sometimes define the market value of property as "the highest price which the property would bring if sold in the open market to a purchaser buying with full knowledge of all of the facts associated with that property." Opp. Mot. at 3-5. Yet this definition seems

ORDER GRANTING IN PART AND DENYING IN PART OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF JOHN KILPATRICK—C-03-01607-RMW
DOH

buyer's survey contradicts this assertion. Kilpatrick discovered that 94% of respondents "indicated they were aware of some general environmental conditions, and most were specifically aware of the perchlorate or 'water contamination.'" *Id*. at 66. When Kilpatrick handed out further information about perchlorate, half of the respondents claimed to know "most" of this information already and a third claimed to know "some" of it. *Id*. at 66-68. Contrary to Kilpatrick's theory, news about the contamination appears to have saturated the marketplace. Kilpatrick also relies on two cases studies: one involving volatile organic compound contamination in Wyoming and one involving benzene, chloroform, acetone, and trichloroethylene contamination in New Jersey. *Id*. at 57-58. Kilpatrick notes that homeowners in Wyoming lost between twenty-one and forty percent of their property values while homeowners in New Jersey sued and "were awarded $17.4 million" in damages. *Id*. at 57-58. Kilpatrick then concludes that "[t]he case studies support the hypothesis that information does not diffuse throughout the market for a considerable period of time after an announcement, and that value impacts at equilibrium are long-term in nature." *Id*. at 58. But nothing in Kilpatrick's descriptions of the case studies suggests this. Kilpatrick never mentions whether the houses lost value immediately or gradually. For these reasons, the court excludes Kilpatrick's testimony to the extent it incorporates plaintiffs' future "lost" appreciation to discount the sales prices of post-announcement properties to arrive at their fair market values.

### C. Kilpatrick May Testify that Plaintiffs' Properties Have Declined in Value Based Upon a Comparison With Similar Properties Sold in 2003

However, Kilpatrick may testify that houses in San Martin lost value in 2003 because they did not appreciate at the rate he believes they would have without the perchlorate. As mentioned, Kilpatrick determined the AARs by averaging annual appreciation rates. Kilpatrick found houses in San Martin that sold twice: once after 1990, and once again in either 1999, 2000, 2001, and 2002. He then grouped the houses by the year of second sale, and determined how much, on average, they had appreciated per year.

---

incompatible with Kilpatrick's theory, which (1) equates "knowledge" with subscribing to Kilpatrick's assumptions and (2) ignores that value is tied to the "highest price." Moreover, both the Appraisal Institute and Kilpatrick's working definition of market value do not refer to "the highest price," but "[t]he most probable price." Kilpatrick Report at 4, 35. The word "probable" suggests that appraisers place a greater emphasis on actual transactions as evidence of value than Kilpatrick claims. Even if many current buyers are paying too much, the fact that they are consummating sales at high prices would suggest that a high-priced sale is "probable." Thus, the court is not convinced that there is as large a disconnect between value and prices as Kilpatrick urges.

ORDER GRANTING IN PART AND DENYING IN PART OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF JOHN KILPATRICK—C-03-01607-RMW
DOH
8

He concluded that houses that sold for the second time in 1999 grew at 11.43%, houses that sold for the second time in 2000 grew at 12.46%, houses that sold for the second time in 2001 grew at 12.70%, and houses that sold for the second time in 2002 grew at 9.88%. *Id*. at 62. Averaging these numbers, Kilpatrick concluded that houses in San Martin generally appreciated at 11.62%. *Id*. Kilpatrick then used this figure in his matched pairs calculation. Kilpatrick added 12% to the price of houses that sold in 2002 and compared them with houses that sold in 2003. Kilpatrick determined that, in 2003, houses in San Martin sold for "between 2.7% and 26.3% less than comparable pre-announcement properties, with an overall average and median difference of negative 12.5% and 13.7%, respectively." *Id*. at 63. The court will permit Kilpatrick to describe this methodology and these conclusions.

Olin argues that Kilpatrick's methodology is flawed because he did not use a control area. Courts generally consider "'whether the expert has adequately accounted for obvious alternative explanations.'" *In re Silicone Gel Breast Implants Products Liability Litigation*, 318 F. Supp. 2d 879, 890 (C.D. Cal. 2004) (quoting Fed. Rule Evid. 702, Advis. Comm. Notes). Olin cites *Flores v. Allstate Texas Llyod's Co.*, 229 F. Supp. 2d 697 (S.D. Tex. 2002), *Munoz v. Orr*, 200 F.3d 291 (5th Cir. 2000), *Valentine v. Pioneer Chlor Alkali Co.*, 921 F. Supp. 666 (M.D. Pa. 1996), *In re TMI Litig. Cases Consolidated II*, 911 F. Supp. 775 (M. D. Pa 1996); *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497 (D. Kan. 1995), and *Blomkest Fertilizer, Inc. v. Potash Corp.*, 203 F.3d 1028 (8th Cir. 2000) for the proposition that "Kilpatrick's calculations . . . violate the well-established axiom, 'correlation does not equate to causation.'" Mot. Excl. at 22:21-22. According to Kenneth Wise, Olin's rebuttal expert, Kilpatrick should have compared the performance of San Martin's housing market after the perchlorate announcement with that of neighboring, non-contaminated communities:

> A proper experiment first would determine whether any variation in annual rates of appreciation is unique to the subject area or is simultaneously observed in neighboring housing markets such as Gilroy or Morgan Hill. Absent this determination, Kilpatrick cannot reach any scientifically meaningful conclusions concerning whether the perchlorate announcement had any effect on property values in his subject area, much less measure the magnitude of any impact that may have occurred.

Wise Supplemental Report, Miller Decl. Ex. D, at 3. Thus, Olin argues, Kilpatrick's "flawed analysis measures nothing more than the effect of economic changes that were impacting the entire Morgan Hill/San Martin/Gilroy area at the time the perchlorate was discovered." Desvousges Report, Miller Decl. Ex. E.

ORDER GRANTING IN PART AND DENYING IN PART OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF JOHN KILPATRICK—C-03-01607-RMW
DOH

The court does not find that Olin's criticisms render Kilpatrick's methodology so unreliable that a jury should not even consider it. For one, contrary to Olin's argument, Kilpatrick does compare San Martin's real estate market to that of Morgan Hills and Gilroy after the perchlorate announcement:

> Six sales of single family homes occurred within the defined subject area during the first quarter of 2003, only two of which closed subsequent to the announcement. An additional ten had sold by the end of the second quarter . . . . [T]here were 47 closings of single family homes within the boundaries of the subject area between July and December, for a total of 64 sales for the year. Not only does this represent a decrease in the absolute number of transactions over the two prior years, but . . . *the surrounding towns of Morgan Hill and Gilroy experienced a 7% and 17% increase in sales activity, respectively, compared to the subject area's 2% decline.*

Kilpatrick Report at 58 (emphasis added). Because Morgan Hill and Gilroy were not affected by the perchlorate, Kilpatrick has empirical support for the notion that the perchlorate—and not some other factor—caused the downturn in the San Martin market. Moreover, Kilpatrick made a reasoned decision not to use a control area. During his deposition, Kilpatrick testified that "San Mart[i]n was a unique market compared to the surrounding residential markets" because it differed in "size of the lots, distribution of the age of homes, the existence of competing condo and apartment markets . . . [and] proximity to upper Santa Clara County or lack thereof." Kilpatrick Depo. at 289:23-290:23. In addition, as Kilpatrick noted, "San Martin is one of the only areas in the county where it is possible to find a number of moderately priced properties with large lots." Kilpatrick Report at 66. Kilpatrick concluded that using "a control area . . . would have been quite problematic from a real estate appraisal perspective." Kilpatrick Depo. at 290:4-6. Olin offers no evidence to contradict Kilpatrick's assertion that neither Morgan Hill nor Gilroy would have served as suitable control areas.[6]

In addition, the cases Olin cites feature experts who failed to account for other potential causes while attempting to establish the causation element of a substantive claim. *See Flores*, 229 F. Supp. 2d at 701 ("[t]he hypothesis which [p]laintiffs postulate is that their claimed allergies are caused by the existence of mold in their homes"); *Munoz*, 200 F.3d at 301 (in Title VII case, expert "stated that discrimination was the 'cause' of the disparities he had observed"); *Valentine*, 921 F. Supp. at 692 ("plaintiffs in the present

---

[6] Olin also contends that Kilpatrick violated the Uniform Standards of Professional Appraisal Practice, which states that "[t]he overall economic climate and variations in the business cycle should be considered and weighed in the performance of the appraisal process." Miller Decl. Ex. K. Yet Kilpatrick's expert report begins with a lengthy analysis of "[t]he South County [a]rea [e]conomy," "[p]opulation and [d]emographics, and [r]egional [and] [s]ubject [a]rea [m]arket [d]ynamics." Kilpatrick Report at 7-13.

case claim that their exposure to chlorine gas . . . has caused them to develop encephalopathy (brain damage), polyneuropathy (multiple nerve cell damage), and 'organic depression'); *TMI*, 911 F. Supp. at 804 (expert's "hypothesis is that radioactive decay observed in the TMI soil samples is attributable to TMI fission products"); *Blomkest*, 203 F.3d at 1038 (expert sought to establish "the existence of industry collusion").[7] Plaintiffs bear the burden of proving causation by a preponderance of the evidence. An expert who fails to eliminate other potential sources of injury fails to link the defendant's wrongdoing to the plaintiff's harm with the requisite degree of certainty. Any such opinion is, by definition, not helpful. However, Kilpatrick attempts to quantify plaintiffs' damages, not establish Olin's liability. Courts are more forgiving of deficiencies in plaintiffs' efforts to "prove up" damages. "To recover in tort, the plaintiff must prove the fact of proximately caused injury with reasonable certainty. When the fact of proximately caused injury is proven sufficiently, the measure of damages to be awarded need only be shown with the degree of certainty that the circumstances of the case permit." *Lueter v. State of California*, 94 Cal. App. 4th 1285, 1303 (2002). Thus, unlike the experts in Olin's authorities, Kilpatrick did not necessarily need to eliminate other possible causes of plaintiffs' damages to render a helpful opinion.

Olin also argues that Kilpatrick's AARs are unreliable. Olin claims that the AARs are mathematically meaningless because they do not measure appreciation in any particular year. For example, although Kilpatrick purports to determine that houses in San Martin appreciated at 12.70% in 2001, this figure actually reflects appreciation that could have occurred at any time between the first time the house sold and 2001. However, Kilpatrick's method is a reasonable attempt to measure an elusive variable. Few houses are bought and then sold a year later. Thus, it would be difficult to measure appreciation rates over one-year increments in a scientifically robust manner.

Olin also argues that Kilpatrick's AAR is demonstrably wrong because minor deletions or additions of data produce divergent results. For example, using data from 1999, 2000, and 2001, Kilpatrick's methodology would have predicted that houses in San Martin would have appreciated 12.2% in 2002. In

---

[7] The one exception, *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. at 1504, involved an expert who made no effort to find evidence that an alleged conspiracy caused the price of a good to increase. As noted, Kilpatrick did compare home sales in San Martin, Gilroy, and Morgan Hill in 2003. Thus, unlike the expert in *In re Aluminum Phosphide Antitrust Litig.*, Kilpatrick has *some* evidence of causation.

ORDER GRANTING IN PART AND DENYING IN PART OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF JOHN KILPATRICK—C-03-01607-RMW
DOH

1  fact, 2002 had a spot appreciation rate of 3.2%.  At his deposition, Kilpatrick acknowledged that he
2  "overstated the magnitude by roughly nine percentage points."  Kilpatrick Depo. at 62:15-21.
3  Nevertheless, the court believes that this criticism goes to the weight, not the admissibility, of Kilpatrick's
4  opinion.  Appreciation rates fluctuate, and it would be unrealistic to require anyone to measure them with
5  precision.  In addition, Kilpatrick never purported to calculate 2002's spot appreciation rate based on the
6  three previous years.  Instead, Kilpatrick used four years of data to predict a general average rate of
7  appreciation.  Olin's argument thus does not truly address Kilpatrick's method.  Similarly, Olin argues that,
8  in the first few months of 2005, houses in San Martin have appreciated over 14.3%: nearly twice
9  Kilpatrick's initial predicted rate of 7.26%.  Although a jury may well find that this fact belies Kilpatrick's
10 opinion, it is not grounds for exclusion.  Indeed, the market's performance during the first few months of
11 2005 may not be indicative of its performance during the rest of the year.  For these reasons, the court
12 holds that Kilpatrick's opinion, except that portion excluded by the court, falls within "the range where
13 experts might reasonably differ."  *Kumho Tire Co.*, 526 U.S. at 149.

## III.  ORDER

For the foregoing reasons, the court grants and denies Olin's motion as follows:

1. The court excludes Kilpatrick's opinion that the fair market values of properties sold after the perchlorate announcement in 2003 must be discounted because the buyers, despite the fact that the market was saturated with information about the perchlorate problem, nevertheless paid more for their properties than they were actually worth.

2. Kilpatrick's opinions are otherwise admissible.  He can testify that plaintiffs' homes declined in value in 2003 because they did not appreciate at an expected rate that year.  To show how he arrived at this conclusion, Kilpatrick may testify about his "repeat sales" and "matched pairs" methodologies to the extent that he does not base them on the opinion excluded in paragraph one above.

DATED:    7/5/05                              /s/ Ronald M. Whyte

                                                    RONALD M. WHYTE
                                                    United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiffs:**

| | |
|---|---|
| Colin L. Pearce | clpearce@duanemorris.com |
| M. Elizabeth Graham | meg@rapazzinigraham.com |
| Richard M. Franco | rmfranco@duanemorris.com |
| Mark P. Rapazzini | mpr@rapazzinigraham.com |
| Timothy W. Moppin | twmoppin@duanemorris.com |
| Matthew Kliszewski | mkkliszewski@duanemorris.com |

**Counsel for Olin:**

| | |
|---|---|
| Randall C. Creech | rcreech@sjlegal.com |
| Keith M. Casto | keith.casto@sdma.com |
| Adam E. Miller | adam.miller@husch.com |
| Carol A. Rutter | carol.rutter@husch.com |

**Counsel for Standard Fusee:**

| | |
|---|---|
| Earl L. Hagstrom | earl.hagstrom@sdma.com |
| Gary A. Sloboda | gary.sloboda@sdma.com |

**Counsel for Interested Party:**

Richard Alexander     amostek@alexanderlaw.com

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**     7/5/05                                    DOH

                                                **Chambers of Judge Whyte**

ORDER GRANTING IN PART AND DENYING IN PART OLIN'S MOTION TO EXCLUDE THE TESTIMONY OF JOHN KILPATRICK—C-03-01607-RMW
DOH